**UNITED STATES of America,
Appellee,**

**v.**

**The NATIONAL COMMITTEE FOR IMPEACHMENT et al., Appellants.**

**Nos. 308, 309, Dockets 72–1982, 72–1995.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1972.

Decided Oct. 30, 1972.

Paul G. Chevigny, New York Civil Liberties Union, New York City (Joel N. Gora, American Civil Liberties Union; Robert L. Bobrick, Norman Dorsen, Marvin N. Karpatin, New York City, of counsel), for appellants National Committee for Impeachment and Elizabeth A. Most.

Randolph Phillips, pro se.

T. Gorman Reilly, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., and V. Pamela Davis, Asst. U. S. Atty., of counsel), for appellee.

Before HAYS, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

In the May 31, 1972, issue of *The New York Times* appeared a two-page advertisement headed "A Resolution to Impeach Richard M. Nixon as President of the United States." This advertisement,[1] comprising 5,100 lines of space and costing $17,850, was paid for by

---

1. The text of the advertisement is appended to this opinion.

"The National Committee for Impeachment," listed certain officers and sponsors as well as attorneys for the executive committee, and contained two contributions coupons at the end. About half of the advertisement and its central portion was occupied by a reprint of a House Resolution, H.R. 976, 92nd Cong. 2d Sess. (1972), introduced by five Representatives on May 10, 1972, alleging among other things that the President has unconstitutionally "arrogated to himself the power to declare war and the power 'to make Rules for the Government and Regulation of the land and naval forces,' which are committed by article I, section 8, clauses 11 and 14 of the Constitution solely to the Congress . . . .," and essentially calling for his impeachment,[2] on the grounds of his Vietnam war policies. The remainder of the advertisement contains language which, the Government urges and the trial court found, makes the National Committee for Impeachment (hereinafter the "National Committee") a "political committee" under section 301(f) of the Federal Election Campaign Act of 1971 (1972 U.S.Code Cong. & Ad. News, p. 13) (hereinafter "FECA" or "the Act"). As such, the National Committee and its two principal officers have been enjoined[3] from "performing the functions of a political committee . . . including the acceptance of contributions and the disbursement of monies . . ., unless it first files statements and reports required by sections 303, 304 and 306 of the Act."[4] The National Committee and its two principal officers have appealed, urging inapplicability of this new regulatory statute to the Committee, as well as the unconstitutionality of Titles I and III of FECA on their face and as applied in this case.[5] The injunction below is also claimed to be excessively broad and a prior restraint on free speech.

Appellants argue that FECA should be narrowly construed to avoid infringing their first amendment rights, by requiring the Government to show a closer nexus between the Committee and a specific candidate than is revealed in the newspaper advertisement which is the basis of this suit and to make a showing that the principal aim or thrust of the organization or its questioned advertisement is to influence an election. We need not reach the constitutional issues

2. The resolution is framed not dissimilarly to the bill of impeachment brought against President Andrew Johnson. Proceedings in the Trial of Andrew Johnson, President of the United States, Before the United States Senate on Articles of Impeachment (1868).

3. Pending appeal on the merits, a stay of the district court's order was granted by Judges Lumbard and Feinberg and was continued by this panel. This appeal was heard on an expedited basis.

4. Section 303 requires a political committee which anticipates receiving contributions or making expenditures of over $1,000 in a calendar year to file a "statement of organization" which must include, among other things, names and addresses of affiliated or connected organizations, principal officers, candidates being supported, and a listing of depositories. 1972 U.S.Code Cong. & Ad.News, p. 15. Section 304 requires political committees to file reports of receipts and expenditures, the names of contributors and recipient candidates. *Id.* at pp. 16–17. Section 306 simply authorizes the Act's supervisory officers, which include the Comptroller General, *see* FECA § 301 (g), 1972 U.S.Code Cong. & Ad.News, p. 13, to prescribe the form of the forms required to be filed and to make certain exceptions to the filing requirements, immaterial here, in the case of local elections. Pursuant to Section 306, the Comptroller General has issued a manual of regulations and instructions for the Act. *See* 37 Fed.Reg. 6156 et seq. (1972).

5. We note that in a pending case in the District Court for the District of Columbia based on the now repealed Federal Corrupt Practices Act of 1925, the defendant has raised the issue of the unconstitutionality of legislative enactments which require the naming of campaign contributors, an argument that could apply to the FECA as well. *Common Cause v. Finance Comm. to Re-elect the President,* Civil No. 1780–72 (D.D.C. filed Sept. 6, 1972), in N. Y. Times, Sept. 30, 1972, at 1, col. 1–2 & 16, col. 4. That issue is not specifically raised here, appellants' claims being more broadly based.

raised by the Act here since we agree with appellants that solely on the strength of this one advertisement and contributions made in response to it the Act is inapplicable to them.

The Act applies only if the National Committee is a "political committee" within the FECA, and more particularly § 301(f) thereof. The Government advances two reasons for urging what it calls the Act's "obvious" applicability. The first is that the National Committee "has attempted to influence the outcome of various Congressional primary and general elections" (Appellee's Brief at 4) in that the advertisement states that the National Committee has placed on its "Honor Roll" in addition to the five original sponsors of the impeachment resolution three congressmen who signed the resolution as co-sponsors and Rep. Paul N. McCloskey, Jr., as the first person who stated publicly that President Nixon should be threatened with impeachment. The advertisement goes on to say:

> The National Committee for Impeachment will devote its resources in funds and publicity in aid of any new candidate for election to the House of Representatives or re-election of an incumbent Member, whether in a primary contest or the actual election contest, whether Republican, Democrat, Independent, or a new party, in the order in which their names are officially printed in The Congressional Record.

The second ground urged by the Government in its brief and supporting papers for our declaring the National Committee to be a "political committee" is that by this advertisement and the contributions made in response to it, the

Committee has attempted to influence "the outcome of the 1972 Presidential and Vice Presidential elections." (Affidavit of T. Gorman Reilly at ¶ 3.) While the Government's brief does not fully articulate a third ground, in the affidavit supporting the motion for a preliminary injunction, as well as on oral argument, it is urged that because the advertisement is derogatory to the President's stand on the Vietnam war, the President is a candidate for re-election, and the war is a campaign issue,[6] the advertisement was an attempt to influence the presidential election. (*Id.* at ¶ 8.) The Brief on the other hand (4–5) relies on the language of the advertisement reading as follows:

> If said majority [of the House of Representatives to pass an impeachment resolution] is not obtained by a certain deadline to be set by the Executive Committee of the National Committee for Impeachment, it will seek to establish, if possible, pursuant to the appropriate legal methods in each of the 50 States of the Nation, a new political party for the nomination and election of a new President and Vice-President of the United States, and of new or incumbent members of the House of Representatives, known as the Puritan Party of the United States.

The Government also notes (Brief at 18–19) that the text of the advertisement concludes with an exhortation "to help finance our work by a contribution of $1 or more," with the above mentioned contribution coupons available to be clipped.

The statute in question provides:

Section 301. When used in this title—

．　　．　　．　　．　　．　　．

6. This was one of the bases of the complaint made about the advertisement to the General Accounting Office by the Schuchman Foundation Center for the Public Interest on June 7, 1972. A second complainant, the Committee for the Re-election of the President, did not spell out its grounds. Common Cause, the third complainant, based its complaint almost exclusively on the fact that the advertisement derogated the President's Vietnam policies. While we put no weight on the fact, of 284 complaints apparently made by the "Campaign Monitoring Project" for Common Cause, the only one being prosecuted as of August 1972 was the one at bar, according to the affidavit of the Project's Research Director. (Affidavit of Thomas R. Pokorni.)

(d) "political committee" means any committee, association, or organization which accepts contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000;

(e) "contribution" means—

(1) a gift, subscription, loan, advance, or deposit of money or anything of value, made for the purpose of influencing the nomination for election, or election, of any person to Federal office or as a presidential or vice-presidential elector . . . .

(f) "expenditure" means—

(1) a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of influencing the nomination for election, or election, of any person to Federal office, or as a presidential and vice-presidential elector . . . .

The Senate Report, S.Rep.No. 92–96, 92nd Cong. 2d Sess., 1972, U.S.Code Cong. & Ad.News, p. 45 et seq., which is particularly important because the Senate Bill was the one passed in lieu of the House bills, may be searched in vain for any passage which throws further light upon the meaning of "political committee" or "made for the purpose of influencing." [7] Here as elsewhere Congress "has voiced its wishes in muted strains and left it to the courts to discern the theme in the cacophony of political understanding." Rosado v. Wyman, 397 U.S. 397, 412, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970). Our chief resources in this undertaking include not only the words of the statute and, in the words of *Rosado, supra* at 412, 90 S.Ct. at 1218, "those common-sense assumptions that must be made in determining direction without a compass," but some fundamental principles of freedom of expression in our democratic form of government.

We deal first with the point of the Government in respect to the "Honor Roll" of Congressmen, noting that in the case of each of the Congressmen named there was no authorization or approval on his or her part in respect to the advertisement.[8] Indeed, there is no evidence of any advance knowledge of the advertisement on the part of any of the Congressmen or of any connection between any of them and the National Committee or that any money received by the National Committee has been expended on behalf of any of them in any way. The Government says it is enough that the advertisement was published and sought money, since publication alone is said to have been an "obvious" political activity that was intended to further the candidacies of the Congressmen so "honored." [9]

■ The words of the Act themselves point toward some more definite connection between candidate and committee than was here involved. Section 303(b)(6) (1972) U.S.Code Cong. & Ad.News, p. 15), for example, includes within the organizational statement required to be filed by a political committee

the name, address, office sought, and party affiliation of (A) each candidate whom the committee is supporting, and (B) any other individual, if

---

7. In ways immaterial to this case the definitions of "contribution" and "expenditure" under previous law were expanded. *See* FECA §§ 301(e)–(f), 1972 U.S.Code Cong. & Ad.News at pp. 12–13. Also the Act plugged the loophole which permitted committees organized in the District of Columbia or United States territories to escape all provisions of the law. *Id.* at 131.

8. One, Congresswoman Bella S. Abzug, on June 2, 1972, was quoted as saying that it was "highly improper" to use an advertisement about the impeachment drive to solicit funds for the election campaigns of candidates; she, as well as some others, said she would not accept such funds. *See N. Y. Times*, June 3, 1972, at 33, col. 4. *See also* 118 Cong. Rec. E5920 (daily ed. June 1, 1972) (statement of Congresswoman Abzug).

9. Parenthetically we note in this connection that two of them, the late William F. Ryan and Bella S. Abzug, were engaged in a primary contest against each other at the time of the publication of the advertisement.

any, whom the committee is supporting for nomination for election, or election, to any public office whatever; or, if the committee is supporting the entire ticket of any party, the name of the party.

While dealing with reports required to be filed by a political committee, the Act relates specifically to election campaigns, including within the scope of contributions that have to be reported:

> the total amount of proceeds from (A) the sale of tickets to each dinner, luncheon, rally, and other fund-raising event; (B) mass collections made at such events; and (C) sales of items such as political campaign pins, buttons, badges, flags, emblems, hats, banners, literature, and similar materials.

§ 304(b)(6), 1972 U.S.Code Cong. & Ad. News, p. 17. Thus, the words of the Act seem to indicate that Congress' concern was primarily with groups organized or at least authorized by a particular candidate and whose principal focus is a specific campaign. The central theme of the advertisement at issue here relates to impeachment of the President, not specific election campaigns or candidates.

The statement in the ad that the Committee will use its "funds and publicity" in aid of any new candidate for election or re-election of an incumbent looks toward the future, but does not imply that the Congressmen named have agreed to such use. It is made, moreover, in the context that an impeachment resolution requires for passage under art. I, § 2, ¶ 5 of the Constitution a vote of 218 of the 435 members of the House of Representatives. We reiterate: the basic

thrust of the advertisement is toward impeachment and war-policy condemnation, not toward the election of Congressmen.

As much or more can be said of the language of the advertisement looking rather vaguely in the future [10] toward the creation of a new party to nominate and elect a President and Vice President and new or incumbent members of the House, contingent upon the National Committee's failure by a "deadline to be set" to secure the majority of House members necessary to pass an impeachment resolution. Again, the central theme is impeachment, not the seeking of funds. Qualitatively, as well as quantitatively, the advertisement seeks support of an impeachment resolution, not the election of political candidates. As such, the purpose of the advertisement as we construe it was at most only incidentally to support candidates and engage in "political activity" within the FECA.

■■ Given that conclusion, we think that the publication of this advertisement alone did not make the National Committee a "political committee" within the FECA. Were we to think otherwise Title III of the Act would raise serious constitutional issues, on which we express no opinion.[11] *See, e. g.,* United States v. Robel, 389 U.S. 258, 262, 265, 266, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (statutes impinging on first amendment rights must be narrowly drawn); Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (first amendment invalidates state statute prohibiting *election day* editorials);[12] NAACP v. Ala-

10. The introductory language to this effect —"If said majority is not obtained by a certain deadline to be set by the Executive Committee of the National Committee for Impeachment . . ."—was omitted in quotation of the advertisement at page 5 of the Government's brief. When this language is added, the context is clear that here also the advertisement was referring to the indefinite future.

11. A Washington, D. C., three-judge court is, at the writing of this opinion, considering the constitutionality of the Federal

Election Campaign Act. ACLU v. Jennings, Civil No. 1967–72 (D.D.C.1972).

12. No distinction may be made for first amendment purposes between a political editorial and a paid political advertisement. *See* New York Times Co. v. Sullivan, 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); United States v. Painters Local Union No. 481, 172 F. 2d 854 (2d Cir. 1949). *Cf.* Business Executives' Move for Vietnam Peace v. FCC, 146 U.S.App.D.C. 181, 450 F.2d 642 (1971), cert. granted, 405 U.S. 953, 92 S.Ct. 1174, 31 L.Ed.2d 230 (1972).

bama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1958) (court-ordered disclosure of names of members of controversial group held an unconstitutional interference with the right of free association); [13] Opinions of the Justices, 284 N.E.2d 919 (Sup.Jud.Ct.Mass., 1972) (proposed Massachusetts statute regulating political advertising declared unconstitutionally vague).

■ We thus construe the words "made for the purpose of influencing" in Section 301(e) and (f) [14] to mean an expenditure made with the authorization or consent, express or implied, or under the control, direct or indirect, of a candidate or his agents. For, in the words of Professor Emerson:

> [R]egulations confined to candidates and election campaigns are directed to a limited end and deal with a limited situation. Hence they can be formulated with some objectivity and avoid the dangers of abuse in administration. This cannot be done with regulations . . . addressed to the innumerable different kinds of people seeking to express themselves for different purposes throughout the whole system of free expression.

The System of Freedom of Expression 640 (Vintage ed. 1970). We also construe the Act to apply only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates. Here neither statutory test is met: any authorization or control by any candidate—indeed any connection whatsoever between the National Committee and any candidate—is missing and the major purpose of the advertisement was to promote the impeachment movement and to condemn governmental policy on the Vietnam war, not to elect candidates. In so saying, we need not determine whether, if one statutory test were met, the statute would be applicable.

In thus narrowly construing the Act we follow United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953), where the Court gave a limited construction to the phrase "lobbying activities" "in the candid service" in Mr. Justice Frankfurter's words "of avoiding a serious constitutional doubt." 345 U.S. at 47, 73 S.Ct. at 546. *See also* Pipefitters Local Union No. 562 v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972) (18 U.S.C. § 610 interpreted so as not to prohibit political expenditures from voluntarily-financed union political funds); United States v. Painters Local Union No. 481, 172 F.2d 854 (2d Cir. 1949) (statute interpreted so as not to prohibit union advertisements in a newspaper of general circulation). *Accord,* United States v. CIO, 335 U.S. 106, 121, 68 S.Ct. 1349, 92 L. Ed. 1849 (1948).

■ Such a construction is, we think, also consistent with the principal purpose of the Act. *See* United States v. Harriss, 347 U.S. 612, 622–623, 74 S. Ct. 808, 98 L.Ed. 989 (1954). That principal purpose, the Commerce Committee report indicates, related to "the problem of political campaign reform and excessively high campaign costs." Sen. Rep. No. 92–96, *supra,* 1972 U.S.Code Cong. & Adm.News, p. 58. Congressional concern was with political campaign financing, not with the funding of move-

13. Attorney Gen. v. Irish Northern Aid Comm., 346 F.Supp. 1384 (S.D.N.Y., Aug. 7, 1972), aff'd without opinion, 465 F.2d 1405 (2d Cir., Aug. 23, 1972), is not inconsistent with the line of cases following NAACP v. Alabama since it involves agents raising money for a civil war in a foreign country. *Cf.* 357 U.S. at 465, 78 S.Ct. at 1163; Communist Party v. SACB, 367 U.S. 1, 90–91, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

14. We are here concerned not only with contributions made to the National Committee; while there is not a shred of evidence that it made any expenditures on behalf of any candidate, the Government argues that paying for the original advertisement itself was an "expenditure" within § 301(f).

ments dealing with national policy. Admittedly, under this interpretation, enforcement of the Act may be made somewhat more burdensome, as the supervisory officials will be forced to glean the principal or major purpose of the organizations they seek to have comply with the Act. The broad administrative discretion which the Government's construction of the Act would allow, however, would itself be incompatible with the first amendment which requires that administrative standards regulating free expression be precisely drawn. *See, e. g.,* Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

▮ We dispose more readily of the Government's suggestion that the Act applies to the National Committee because—quoting from the affidavit supporting its motion for a preliminary injunction—"with respect to the upcoming election for President and Vice-President of the United States, the National Committee derogates President Nixon's stand on a principal campaign issue—the Vietnam war." On this basis every position on any issue, major or minor, taken by anyone would be a campaign issue and any comment upon it in, say, a newspaper editorial or an advertisement[15] would be subject to proscription unless the registration and disclosure regulations of the Act in question were complied with. Such a result would, we think, be abhorrent; the Government fails to point to a shred of evidence in the legislative history of the Act that would tend to indicate Congress meant to go so far.

Any organization would be wary of expressing any viewpoint lest under the Act it be required to register, file reports, disclose its contributors, or the like. On the Government's thesis every little Audubon Society chapter would be a "political committee," for "environment" is an issue in one campaign after another. On this basis, too, a Boy Scout troop advertising for membership to combat "juvenile delinquency" or a Golden Age Club promoting "senior citizens' rights" would fall under the Act. The dampening effect on first amendment rights and the potential for arbitrary administrative action that would result from such a situation would be intolerable. The suggestion in the Government's supporting affidavit and on oral argument is inconsistent with what Judge Learned Hand so eloquently described as "the spirit of liberty" and which he so beautifully defined as "the spirit of Him who, near two thousand years ago, taught mankind that lesson it has never learned, but has never quite forgotten; that there may be a kingdom where the least shall be heard and considered side by side with the greatest." L. Hand, The Spirit of Liberty 190 (I. Dilliard ed. 1952). We reject the suggestion for we believe Congress had no intention of regulating the expression of opinion on fundamental issues of the day.

The granting of a preliminary injunction is therefore reversed, and the cause remanded for a hearing on the merits at which the Government may, of course, seek to adduce proof that the statutory standards here enunciated were met in this instance.

Reversed and remanded.

15. At argument, Government counsel attempted valiantly to distinguish newspaper editorials from paid advertisements. But as Judge Augustus Hand pointed out in United States v. Painters Local Union No. 481, 172 F.2d 854, 856 (2d Cir. 1949), not everyone can afford to own a newspaper; indeed in this day and age fewer and fewer people can do so and hence must resort to purchasing space in someone else's newspaper or time on someone else's radio or TV station. *Cf.* Business Executives' Move for Vietnam Peace v. FCC, 46 U.S.App.D.C. 181, 450 F.2d 642 (1971), cert. granted, 405 U.S. 953, 92 S.Ct. 1174, 31 L.Ed.2d 230 (1972) (first amendment requires broadcasters to allow purchase of air time for political advertisements).