**NEW YORK CIVIL LIBERTIES UNION, INC., Plaintiff,**

v.

**Remo J. ACITO et al., Defendants.**

**No. 75 Civ. 5378.**

United States District Court, S. D. New York.

July 20, 1978.

---

Joel M. Gora, American Civil Liberties Union Foundation, New York City, Paul G. Chevigny, New York Civil Liberties Union, New York City, for plaintiff.

Edward R. Patrick, David E. Blabey, State Bd. of Elections, Albany, N. Y., for defendants.

## MEMORANDUM OPINION

MOTLEY, District Judge.

The plaintiff in this action is the New York Civil Liberties Union, Inc. (NY-CLU), a New York corporation and affiliate of the American Civil Liberties Union (ACLU). The defendants are the Commissioners of the New York State Board of Election—sued both in their individual and

official capacities. The essence of the Amended Complaint is the NYCLU's claim that its members' First Amendment [1] rights to freedom of speech and association are abridged by New York State Election Law § 14–100(a) which defines "political committee" for the purpose of reporting campaign receipts and expenditures.[2] Plaintiff moves for summary judgment, Rule 56, Fed.R. Civ.P., seeking a declaratory judgment [3] that § 14–100(a) is unconstitutional on its face or, alternatively, unconstitutional as applied to plaintiff. Defendants cross-move for summary judgment dismissing the complaint. The court holds that § 14–100(a) is unconstitutionally overbroad in that it imposes excessive restraints on the exercise of First Amendment rights under the Constitution.

■ This court has jurisdiction under 28 U.S.C. § 1343 since plaintiff claims a violation of its members' rights under 42 U.S.C. § 1983. A declaratory judgment is sought pursuant to 28 U.S.C. § 2201. A single judge may appropriately decide the constitutionality of a state statute when only declaratory, as opposed to injunctive relief is sought. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 155, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

Section 14–100(a) reads in pertinent part as follows:

. . . "political committee" means any corporation aiding or promoting and any committee or combination of one or more persons operating or co-operating to aid or to promote the success or defeat of a political party or principle, or of any question submitted to vote at a public election; or to aid or take part in the election or defeat of a candidate for public office or to aid or take part in the election or defeat of a candidate for nomination at a primary election or convention, including all proceedings prior to such primary election, or of a candidate for any party position voted for at a primary election, or to aid or defeat the nomination by petition of an independent candidate for public office . . . . (relevant portion underscored)

The statutory scheme operates such that when an organization or person is deemed a "political committee" as defined in § 14–100(a), that organization or person is then subject to the various record-keeping and reporting provisions of Article 14 of the Election Law (Article 14).

Plaintiff argues that, while reporting and disclosure provisions may be constitutional as a general proposition, it is unconstitutional to subject *certain* persons or organizations, such as the NYCLU, to the requirements of Article 14. The defendants do not dispute that the NYCLU is a political committee as defined by § 14–100(a).

*Factual Background*

In the fall of 1975 the voters of New York State were asked to vote on a proposed amendment to the New York State Constitution known as the Equal Rights Amendment (ERA). Under § 1–104(17) of

---

1. The First Amendment applies to the states through the Fourteenth Amendment. *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

2. A brief legislative history of this section is relevant. "Political Committee" was first defined in § 320 of the Election Law. L.1922, c. 588, § 320 as amended by L.1935, c. 5, § 1. Section 320 was superseded by the New York State Campaigns, Elections and Procedures Law of 1974, L.1974, c. 604, § 1 as amended by L.1974, c. 605, § 1; L.1976, c. 577. The definition of "political committee" was codified in Election Law § 467(a). That section was in effect when this lawsuit was filed. As of December 1, 1977 the Election Law has been recodified by L.1976, c. 233, § 1 "Political Commit-

tee" is now defined by Election Law § 14–100(a). For the purpose of the constitutional issue raised in this case, the Election Law as recodified is essentially identical to the Election Law which was in effect when the Amended Complaint was filed on November 10, 1975. This opinion will refer to the Election Law as recodified.

3. Plaintiff's original complaint additionally prayed for injunctive relief which would have necessitated the convening of a three-judge court. 28 U.S.C. § 2281. That section, although repealed by Pub.L. 94–381, § 1, 90 Stat. 1119, still applies to actions commenced on or before August 12, 1976. The original complaint was filed on October 29, 1975.

the Election Law (formerly § 266(3)), the ERA was a "question" for the purposes of § 14–100(a). The NYCLU had worked actively in support of the ERA contributing both personnel and money in an effort to win votes in favor of the amendment. The money spent on the amendment campaign was drawn from the general fund of the NYCLU. The staff members who worked on the campaign were not hired specifically for the purpose but did other work for the NYCLU as well. Plaintiff alleges, and the defendants do not dispute, that the activities of plaintiff with respect to the 1975 ERA campaign would make the NYCLU a political committee under § 14–100(a).

As a political committee, the NYCLU has the following general obligations under the Election Law:

1) The treasurer of the political committee must file sworn statements with the State Board of Elections (Board) stating all the receipts, expenditures and liabilities of the committee. The information must include, among other things, the specific amounts received, the names and addresses of the contributors and the date the contributions were received. Similarly detailed information must be supplied as to expenditures. With certain exceptions, expenditures of less than $10 and receipts of $50 or less need not specifically be accounted for. Section 14–102 (formerly § 473).

2) The treasurer of the political committee must keep detailed, bound accounts of all receipts and expenditures for any given election for a period of five years after the last statement was filed with respect to that election. Any receipts or expenditures in excess of $100 must be by check, draft or other instrument. Section 14–118 (formerly § 481).

3) All contributions shall be in the true name of the contributor. Section 14–120 (formerly § 482).

4) A person who fails to file a statement is subject to a maximum civil penalty of $100. If the failure to file was knowing and wilful, the person is guilty of a misdemeanor. Section 14–126 (formerly § 485).

The NYCLU argues that the above provisions of the Election Law are generally burdensome and violate the First Amendment rights of members of organizations such as itself which are not traditionally regarded as political organizations, but which are organizations designed to educate the public on a variety of both political and non-political topics. It is, of course, undisputed that these organizations which seek to convey various ideas to the public enjoy the protection of the First Amendment. The question is whether these organizations in general, and plaintiff in particular, can be obligated to comply with the requirements of the New York Election Law before voicing their opinions on any "question" which is before the voters of this State at an election.

Plaintiff argues that the statute defining "political committee" may be held to be unconstitutional on any one of three independent theories: First, the definition of "political committee" is overbroad since it would include organizations whose *primary* purpose is not to influence the outcome of any given election. Since the governmental interest is minimal in applying the provisions of the Election Law to essentially non-political organizations such as these, the Act cannot be constitutionally applied to these groups where the application would violate their members' First Amendment rights.

Second, the definition is unconstitutionally vague in that it may include some organizations (subjecting them to civil or criminal penalties) even though it is not apparent to those organizations that their activities come within § 14–100(a).

Finally, the NYCLU argues that the statute is unconstitutional as applied to the NYCLU since it is uncontroverted that disclosing the names of NYCLU contributors may discourage future contributions to the organization thus chilling its members' First Amendment activities.

Defendants claim that the issue is a far narrower one than that posed by plaintiff. They first note that the Election Law serves the State's compelling interest in

assuring that elections are free of corruption and improper influence. The issue which defendants would have the court decide is whether it is constitutional to require the NYCLU to report expenditures made in support of the ERA vote and to report *only* those contributions which were "earmarked" for political purposes.

*Preliminary Issues*

On April 6, 1978 the court heard oral argument on this motion. At that time, the court requested that the parties submit supplemental briefs on two issues not raised in the original briefs: 1) whether there is a case or controversy and 2) whether this court should abstain from deciding this case in order to give the state courts an opportunity to first decide the questions involved.

1. *Case or Controversy*

In order for this court to have jurisdiction over this action, which seeks a declaratory judgment, there must be a case or controversy. United States Constitution, Art. III, § 2. The Supreme Court has defined "controversy" in the context of a suit seeking declaratory relief:

> A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of dam-

ages. And as it is not essential to the exercise of the judicial power that an injunction be sought, allegations that irreparable injury is threatened are not required.

*Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted). In addition to the facts of this case already noted above, other facts are relevant to the question whether a justiciable controversy exists.

The reason why the "case or controversy" question arises is that the defendants have not yet taken any action whatever against the NYCLU. This action was initiated by the NYCLU when it became apparent to it that it was subject to the reporting and disclosure provisions of Article 14. Defendants do not dispute, and in fact they contend, that the activities of the NYCLU in connection with its ERA referendum campaign subjects the NYCLU to the provisions of Article 14. At oral argument before this court on April 6, 1978 defendants refused to stipulate that they would not require the NYCLU to comply with Article 14 when this lawsuit terminated. When asked why the state was not now pressing for compliance, defendant answered that it would take no action while this lawsuit was pending.

Other undisputed facts suggest that plaintiff has a legitimate fear that it will be forced to comply with the reporting and disclosure provisions of Article 14. The current statute was passed in 1974 during a period of nationwide enactment of campaign "reform" legislation. Various provisions of the law broadened the sweep of the predecessor statutes. The 1974 law also created the State Board of Elections and gave it new enforcement powers. The new law made wilful noncompliance with the reporting and disclosure provisions punishable as a misdemeanor.

In connection with the 1975 ERA campaign, numerous groups filed reports with the Board. In addition, the Board informally contacted may groups who failed to file reports. As a result, these groups were

convinced to remedy their deficiencies. The Board has initiated enforcement action against certain individuals who have refused to comply with the reporting requirements.

Where a statute applies to the plaintiff's activities and the statute has been recently enacted and is not moribund (*cf. Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)), the Supreme Court has held that there is a justiciable controversy *despite* the fact that the plaintiff has not yet been charged criminally. *Doe v. Bolton*, 410 U.S. 179, 188–89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In *Doe v. Bolton* the court allowed plaintiffs to challenge a Georgia anti-abortion statute and seek a declaratory judgment that it was unconstitutional even though plaintiff had not yet obtained an abortion.

In *Steffel v. Thompson*, 415 U.S. 452, 458–59, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the Court held that where there was a *threat* of enforcement of a trespassing statute against plaintiff in violation of his First and Fourteenth Amendment rights, plaintiff's action for a declaratory judgment did present an actual controversy under the Constitution. The court explained:

> In these circumstances [where criminal prosecution has been threatened although not initiated], it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. Moreover, petitioner's challenge is to those specific provisions of state law which have provided the basis for threat of criminal prosecution against him.

415 U.S. at 459, 94 S.Ct. at 1216 (citation omitted).

In the instant case, the NYCLU has also demonstrated that there is a very definite possibility that the NYCLU will be forced to comply with Article 14—although the State Board of Elections has not "threatened" enforcement of the statute against the NYCLU in so many words. In fact, the instant case is a stronger one than *Steffel* in which to find a justiciable controversy.

In addition to the possibility that the state will seek compliance by the NYCLU, the NYCLU, at the time of the suit, and, presumably at the present moment as well, was under an *affirmative duty* to submit certain reports and keep certain records in connection with its election activities. This action is brought, in part, to seek a court determination that the NYCLU does not have to comply with its outstanding statutory duties.

Three cases, discussed more fully *infra*, are directly on point. *American Civil Liberties Union, Inc. v. Jennings*, 366 F.Supp. 1041 (D.D.C.1973) (three-judge court), *vacated as moot sub nom., Staats v. ACLU*, 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975); *Buckley v. Valeo*, 171 U.S.App.D.C. 172, 519 F.2d 821 (1975) (en banc) *aff'd in part, rev'd in part*, 424 U.S. 1, 96 S.Ct. 672, 46 L.Ed.2d 659 (1976); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

In *Jennings*, the ACLU sought a declaratory judgment declaring the reporting and disclosure provisions of the Federal Election Campaign Act to be unconstitutional. The court held that although the plaintiff had not been specifically threatened with enforcement of the Act, there was nonetheless a justiciable controversy. The court explained the reasons for its holding. Its rationale is equally applicable to the case at bar:

> Plaintiffs allege that as controversial organizations the imposition of the reporting and disclosure requirements, presumably made operative by the publication of the advertisement, would result in an unconstitutional abridgment and chilling of their rights of freedom of association and privacy guaranteed by the First, Fourth and Ninth Amendments. They contend that the existence of the statute, in its present form, leaves forever open the possibility of enforcement against them as well as other non-partisan, non-political groups, thereby placing them in the difficult and untenable position of, on the one hand, having to decide whether they will exercise First Amendment rights, i.

e., publish material similar to that which prompted this litigation, and in so doing risk being caught within the Title III net of reporting and disclosure requirements, thereby sacrificing other constitutional rights of association and privacy, or, on the other hand, forego these former rights to protect the latter. The potential for such a situation, with its clear likelihood of causing chilling effects upon plaintiffs, leads us to conclude, following Justice Brennan's *Perez* approach [*Perez v. Ledesma,* 401 U.S. 82, 93, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971)], that the Title III questions are ripe for declaratory action. (366 F.Supp. at 1048)

In *Buckley v. Valeo, supra,* 171 U.S.App. D.C. at 194, and n. 50, 519 F.2d at 843 and n. 50, the court reached the constitutionality of certain sections of the Federal Election Campaign Act despite the fact that there were no prosecutions pending under the law at the time. The court held that where certain statutes exerted an "inhibitory effect" on the exercise of First Amendment rights, the constitutionality of the statutes was an issue ripe for adjudication and that plaintiffs were not required to violate the criminal law in order to obtain constitutional review.

The Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) held that "at least some of the appellants have a sufficient 'personal stake' in a determination of the constitutional validity of" the reporting and disclosure provisions of the Federal Election Campaign Act to present a justiciable controversy. In *Buckley,* as in the instant case, enforcement was not sought against any of the plaintiffs.

■ In conclusion, this court holds that this case presents a sufficient "controversy" to vest this court with jurisdiction to rule on plaintiff's request for a declaratory judgment.

### 2. *Abstention*

■ The court has asked the parties to brief the question whether it should abstain from reaching the merits of this case until the state courts have had an opportunity to construe § 14–100(a). The court finds that abstention would not be appropriate under the circumstances.

In *Harman v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), the Supreme Court ruled on the constitutionality of certain Virginia statutes relating to the qualifications of voters. In holding that abstention was inappropriate, it set forth the rationale of the abstention doctrine:

> In applying the doctrine of abstention, a federal district court is vested with discretion to decline to exercise or to postpone the exercise of its jurisdiction in deference to state court resolution of underlying issues of state law. *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. *E. g., Railroad Comm'n v. Pullman Co., supra.* The doctrine, however, contemplates that deference to state court adjudication only be made where the issue of state law is uncertain. 380 U.S. at 534, 85 S.Ct. at 1181.

In the First Amendment area, the Supreme Court has severely limited the scope of the district court's discretion to abstain. "[T]he abstention doctrine is inappropriate for cases such as the present one where . . . statutes are justifiably attacked on their face as abridging free expression . . . ." *Zwickler v. Koota,* 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444 (1967), quoting *Dombrowski v. Pfister,* 380 U.S. 479, 489–90, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The Court in *Zwickler* reasoned that "Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." 389 U.S. at 248, 88 S.Ct. at 395. The Court then noted

that abstention is particularly inappropriate when as in the instant case, the statute is challenged as overbroad. 389 U.S. at 249–50, 88 S.Ct. 391.

■ "Though never interpreted by a state court, if a state statute is not fairly subject to an interpretation which will avoid or modify the federal constitutional question, it is the duty of a federal court to decide the federal question when presented to it." *Zwickler, supra,* 389 U.S. at 251, 88 S.Ct. at 397. It can be argued that, with respect to § 14–100(a), that section only applies to those organizations the major purpose of which is to support or to oppose any question submitted to vote at a public election. This narrow interpretation of the statute would not present constitutional problems. See discussion, *infra.* However, as discussed *infra,* the state courts and State Board of Election have already interpreted the challenged statute—although not in conformance with the acceptable narrow and interpretation. In this litigation the defendants takes the clear position that the statute does apply to plaintiff. The Board has thus declined to narrow the statute further, and, given the opinions of the state courts and the Board, it does not appear that the definition of "political committee" is an uncertain question of state law. *Harman v. Forssenius, supra.*

■ The Court in *Zwickler* held that, although state courts are the final expositors of state law, the federal courts have the primary duty to decide federal constitutional questions. 389 U.S. at 252, 88 S.Ct. 391. Abstention would be especially inappropriate in the instant case where

the attack upon the statute on its face is for repugnancy to the First Amendment. In such cases to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect.

389 U.S. at 252, 88 S.Ct. at 397.

Accordingly, this court declines to abstain from deciding the federal constitutional issues presented to it.

*Legal Background*

Four significant cases have already subjected the Federal Election Campaign Act of 1971[4] (Federal Act) to constitutional scrutiny. The Federal Act contains similar reporting and disclosure provisions as the state Act in question.

*Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) held certain sections of the Federal Act constitutional and struck other sections. Although *Buckley* was the last work, it drew from and was based on three prior decisions: *United States v. National Committee for Impeachment,* 469 F.2d 1135 (2d Cir. 1972); *American Civil Liberties Union, Inc. v. Jennings,* 366 F.Supp. 1041 (D.D.C.1973) (three judge court), *vacated as moot sub nom, Staats v. ACLU,* 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975); and *Buckley v. Valeo,* 171 U.S.App.D.C. 172, 519 F.2d 821 (1975) (en banc), *aff'd in part rev'd in part,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

In *National Committee* the United States sought to enjoin The National Committee for Impeachment from publishing a newspaper advertisement calling for the impeachment of President Nixon. The Government argued that the Committee was a "political committee" as defined in the Federal Election Campaign Act of 1971. As such the Government argued that the National Committee was first required to file statements and reports regarding its contributions and expenditures before it could be allowed to print the advertisement.

The Second Circuit held that the Committee was not a political committee under the Act. The court first noted that if it were such, then "the Act would raise serious con-

4. 86 Stat. 3, as amended by the Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263.

stitutional issues" since statutes impinging on First Amendment rights must be narrowly drawn. 469 F.2d at 1140. The court then proceeded to hold that the Committee was not a political committee on two independent grounds. First and perhaps the primary holding, the Federal Act did not encompass the advertisement because the expenditures were not "made for the purpose of influencing" the choice of a particular candidate. Second, and most important for our purposes, the court held that the definition of "political committee" must be narrowly construed. A political committee only includes "committees soliciting contributions or making expenditures the *major purpose* of which is the nomination or election of candidates." 469 F.2d at 1141 (emphasis added).

In *Jennings*, the American Civil Liberties Union sought to place a newspaper advertisement listing the names of those United States Representatives who had previously opposed President Nixon's anti-busing policy. The *New York Times* refused to print the advertisement until the ACLU had complied with the provisions of the Federal Act. The ACLU brought suit for a declaratory judgment excluding it from the operation of the Act.

The three-judge court in *Jennings* explicitly followed the Second Circuit in *National Committee* and held that the record keeping and disclosure provisions of the Act are applicable "only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates."[5] 366 F.Supp. at 1057. The court placed this narrow construction on the statute in order to avoid an otherwise serious constitutional question. The court noted that it is clear beyond cavil that "public disclosure and reporting of membership lists cast a chilling effect upon an individual's right to associate freely and

to voice personal views through organizational ties." 366 F.Supp. at 1055 (citations omitted). It strongly implied that if the ACLU were deemed to be a political committee under the Act, the Act might be unconstitutional as an overbroad infringement of First Amendment rights.

The third case, *Buckley v. Valeo* (D.C. Cir.), was the first to hold a section of the Federal Act unconstitutional. Section 308 of the Act, 2 U.S.C. § 437a, provides that any organization "expend[ing] any funds . . . for the purpose of influencing the outcome of an election" must make the disclosure specified in that section. The court observed that

> section 437a is susceptible to a reading necessitating reporting by groups whose only connection with the elective process arises from completely nonpartisan public discussion of issues of public importance. 171 U.S.App.D.C. at 221, 519 F.2d at 870. [S]ection 437a may also demand disclosure by plaintiff New York Civil Liberties Union [since it] publicizes in newsletters and other publications the civil liberties voting records, positions and actions of elected public officials, some of whom are candidates for federal office. At 222, 519 F.2d at 871.
>
> In no lesser degree, section 437a may affect group activity extending from one end of the spectrum of public issue-discussion to the other. . . . Indeed, 'every little Audubon Society chapter [might] be [intercepted], for 'environment' is an issue in one campaign or another. On this basis, too, a Boy Scout troop advertising for membership to combat 'juvenile delinquency' or a Golden Age Club promoting 'senior citizens' rights [might] fall under the Act.

At 222, 519 F.2d at 871 quoting *National Committee, supra,* 469 F.2d at 1142.

**5.** The full test is actually a two pronged one: the campaign expenditures must be "made with the authorization or consent, express or implied, or under the control, direct or indirect, of a candidate or his agents" *and* the reporting and disclosure provisions are applicable "only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates." 366 F.Supp. at 1057. *National Committee* first formulated this test, but left unanswered whether both conditions, or merely one of them, must be met. The first part of this test is obviously inapplicable to referenda.

The *Buckley* court was concerned with the possibility that § 437a could be applied to "compel disclosure by groups that do no more than discuss issues of public interest on a wholly non-partisan basis." 171 U.S. App.D.C. at 223, 519 F.2d at 872. In order to bring the section within constitutional bounds, the court attempted to narrow it to apply only to groups whose "purpose" or "design" was "to influence" the outcome of an election. At 225, 519 F.2d at 874. This attempt, however, was not successful because the court then determined that a "purpose of influencing" and a "design to influence" were impermissibly vague standards. Using that criteria, no group could ever be sure that its election activities would not bring it within the reporting and disclosure requirements of the Federal Act.

In a last attempt to save this section, the court tried to use the approach of *National Committee* and *Jennings*. However, § 437a could not be applied only to groups whose "major purpose" was the nomination or election of candidates because then § 437a would become a mere duplicate of the primary disclosure provision, § 434(b). The court held that § 437a was unconstitutional.

On appeal to the Supreme Court, the parties did not dispute the finding that § 437a was unconstitutional. The validity of other disclosure provisions was at issue. The Court upheld the constitutionality of these provisions as interpreted and narrowed by *National Committee* and *Jennings*. The Court reasoned that although the reporting and disclosure requirements did impinge on certain First Amendment rights, the government's interest in preserving the integrity of the election process justified the imposition of these requirements on groups whose main purpose was the nomination or election of candidates. *Buckley v. Valeo, supra,* 424 U.S. at 60–74, 96 S.Ct. 612. *See also Buckley, supra,* 171 U.S.App.D.C. at 214 n. 112, 519 F.2d at 863 n. 112.

*The Merits*

■ Based on the First Amendment principles involved and on this court's reading of the four cases discussed above, this court is of the opinion that the reporting and disclosure requirements of Article 14 of the New York Election Law can only be constitutionally applied to those groups the major purpose of which is the success or defeat of a "political party or principle, or of any question submitted to vote at a public election", § 14–100(a).[6]

■ This court finds that § 14–100(a) has not been successfully narrowed by authoritative pronouncements of the New York Court of Appeals or the New York State Board of Elections. The statute on its face is, therefore, a violation of the First Amendment and is thus unconstitutional as applied to state referenda.

As previously noted, the defendants contend that the court must decide the narrow issue of whether the NYCLU must report only those contributions which are "earmarked" for use in promoting the success or defeat of a question. If only earmarked monies need be reported, argues defendants, then there is a minimal danger that the First Amendment activities of the NYCLU will be chilled by the disclosure of its contributors. Also, disclosing only earmarked contributions will substantially further the policy of the Act in assuring that the voters know who is actually supporting or opposing the issues before them.

■ The court finds that it need not decide this question since defendants have not shown that the statute has been narrowed by any authoritative body to apply only to earmarked contributions. Defendants point to formal opinions of the New York State Board of Elections (Board) as the source of this interpretation of § 14–100(a).[7] However, in two opinions, 1975 Op.

---

6. Those groups which must report would also include groups which satisfy the criteria in footnote 5, *supra*.

7. Such opinions should be considered as authoritative pronouncements on the interpretation of state law. *Broadrick v. Oklahoma,* 413

# 13 and 1976 Op. # 5, the Board proposed the following test to determine whether an organization is a political committee under § 467(a): "Does the organization solicit or expend funds for or on behalf of any specific party(s) or candidate(s)?" Even if this test were, for our purposes, expanded to include the expenditure of funds for any specific "question", there is not the slightest suggestion in this test that only those funds which are *earmarked* for use in opposing or supporting a question need be reported.[8]

Defendants have set forth no legislative history which might explain the scope of § 14–100(a). They have cited a New York case interpreting former § 320 of the Election Law which contains almost identical pertinent language to § 14–100(a). *Matter of Woodbury*, 174 App.Div. 569, 160 N.Y.S. 902 (3d Dept.), *aff'd*, 220 N.Y. 675, 116 N.E. 1084 (1916). That case held that the Home Rule Tax Association was a political committee under § 320 because it circulated literature opposing a certain proposition before the voters. It was not required to report the general receipts and expenditures of the organization, but only those "receipts and expenditures which entered into the campaign carried on by it to defeat the proposition." 174 App.Div. at 571, 160 N.Y.S. at 903.

This case does not support defendants' theory that only those contributions earmarked by the contributors would have to be reported. Under the language of *Woodbury*, a donor's contribution would have to be reported if the money were used in the campaign—whether or not the donor earmarked the money for that purpose.

■ The general rule in the case of a statute of doubtful constitutionality is that the court "will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *United States v. Thirty Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971). While a federal court can so limit a federal statute, this court does not have the power to authoritatively construe this *state* statute. 402 U.S. at 369, 91 S.Ct. 1400. Absent any limiting construction, § 14–100(a) must stand or fall on its express language.

The constitutional question in this case has not been previously decided, although, as noted, past cases have dealt with closely connected issues. Both *National Committee* and *Jennings* did not have to decide whether the federal reporting and disclosure statute was unconstitutional since those courts were able to put a limiting construction on the statute. The D. C. Circuit in *Buckley* held that § 437a was unconstitutionally vague. That section is worded differently from § 14–100(a) and is found in the context of a different regulatory scheme.[9] The three above cases and the Supreme Court's ruling in *Buckley*, clearly serve as important guidelines in determining the constitutionality of § 14–100(a), but an independent constitutional determination must be made.

The general principles regarding the constitutionality of election reporting and disclosure requirements were set forth by the Supreme Court in *Buckley*. Part II of that opinion is devoted to the reporting and disclosure requirements of the Federal Act. 424 U.S. at 60 *et seq.*, 96 S.Ct. 612. After reciting the history of federal disclosure requirements, the Court set forth the general principles involved in determining the constitutionality of the specific provisions in question. "[C]ompelled disclosure, in itself,

---

U.S. 601, 617, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The Board has the power to promulgate rules and regulations relating to the Act. Section 3‑102(a).

**8.** The court adds parenthetically, that even if "earmarked" were the standard, the vagueness of the term would subject it to constitutional attack. Are contributions earmarked when accompanied by a cover letter praising the political campaign or merely praising the activities of the organization? Are all contributions

around election time presumptively earmarked or only those contributions which exceed normal levels?

**9.** The relevant federal language was the expenditure of funds "for the purpose of influencing the outcome of an election." Section 14‑100(a) applies to organizations which "promote the success or defeat of . . . any question submitted to vote at a public election." The Board has also issued various authoritative statements defining the scope of the section.

can seriously infringe on privacy of association and belief guaranteed by the First Amendment." 424 U.S. at 64, 96 S.Ct. at 656. "[S]ignificant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. . . . the subordinating interests of the State must survive exacting scrutiny. . . . there [must] be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." 424 U.S. at 64, 96 S.Ct. at 656 (footnotes and citations omitted). The Court further explained that groups have a strong First Amendment interest in not disclosing the names of those who have contributed to the organization. 424 U.S. at 65–66, 96 S.Ct. 612.

 In addition to association rights, the First Amendment also guarantees citizens the right to speak out at election time in order to influence the course of government affairs. *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). This freedom may also be chilled by reporting and disclosure requirements which are backed by civil and criminal penalties.

Turning to the instant case, there is no serious argument against plaintiff's claim that, in the words of the Supreme Court, under Article 14 "public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute"—thus impinging on First Amendment rights. 424 U.S. at 68, 96 S.Ct. at 658. Compliance with the reporting requirements of Article 14 is not a trivial task. Various records must be maintained and kept for a five year period; reports must be filed; violators are subject to civil and even criminal penalties. Groups that may wish to campaign for or against a certain referendum issue, regardless of the fact that the group may have been apoliti-

cal until that election, must comply with Article 14. Article 14 applies both to small and to very large groups alike. In many instances, especially those involving small and relatively unsophisticated organizations, the thought of hiring an attorney and researching and complying with the law will cause the organization to simply refrain from any political activities rather than go through the compliance headache.

The court need not dwell on the *general* governmental interest in assuring that elections are free of corruption and ignorance.[10] That interest, which is profound, is the basis for the Supreme Court's decision in *Buckley* upholding various portions of the Federal Act. The issue in the instant case is whether the more *limited* governmental interest in applying the Act to the wide spectrum of groups apparently embraced by the definition of "political committee" outweighs the loss of these groups' First Amendment rights. The definition of "political Committee" differs in the federal and State versions of the campaign acts. The constitutionality of Article 14, i. e., whether there is a "relevant correlation" between the information disclosed and the governmental interests furthered, will turn on the *specific* governmental interests which are furthered by the application of Article 14 to groups such as the NYCLU. The court will thus consider how the reporting and disclosure requirements would actually work as applied to plaintiff and those groups similarly situated.

It is well known that the NYCLU is not primarily a political organization but is generally devoted to protecting the rights of persons under the Bill of Rights. Although the NYCLU as an affiliate of the ACLU is barred from endorsing or opposing any candidate for public office, it does take positions on legislative matters and other public issues. The annual budget of the NYCLU at the time of suit was $300,000 to $400,000.

---

**10.** Plaintiff argues that the application of Article 14 to plaintiff should be held unconstitutional because the government's interest in disclosing *referenda* contributions and expenditures is less compelling than its interest in disclosing the financing of *candidates'* campaigns. Since this court holds that § 14–100(a) is unconstitutional on other grounds, this question need not be reached.

There is an admission that over $1,000 was spent on the ERA campaign, but no party suggests that the money spent represented a significant portion of the total budget.

There was no separate ERA fund; all expenditures came out of general revenue. No contributions were earmarked for the ERA campaign. Many contributions would not comply with the express terms of Article 14 if that Article were held applicable to the NYCLU. The NYCLU contends that it could not, for various reasons, comply with all the reporting and disclosure requirements of the statute.

Defendants admit that at least five of the NYCLU's approximately 40,000 members have been subjected to community hostility after their association with plaintiff had become known. This, admittedly, was sufficient to deter these persons from associating with plaintiff.

■ Based on the above facts, and especially those recited in the last paragraph, § 14–100(a) appears to be unconstitutional as applied to the NYCLU. The section has not been successfully limited by either the New York Court of Appeals or the Board so as to be inapplicable to plaintiff. Plaintiff has demonstrated, as required by the Supreme Court in *Buckley,* 424 U.S. at 74, 96 S.Ct. at 661, that there is a "reasonable probability that the compelled disclosure of a [group's] contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties."

The question at this juncture is, if the statute is unconstitutional as applied to the NYCLU, should the court go further and rule on the question of whether the statute is unconstitutional on its face as being overbroad. The Supreme Court has held statutes unconstitutional on the ground of over-

breadth despite the availability of a narrower "as applied" holding. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). The reason for the expansive holdings was succinctly stated by the Court in *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810, 833 (1977).

> The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. . . . The reason for the special rule in First Amendment cases is apparent: an overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute. (Citations omitted).

■ The rationale and scope of the First Amendment overbreadth doctrine was recently described by the Court in *Broadrick v. Oklahoma,* 413 U.S. 601, 611 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The First Amendment needs breathing space, and statutes which attempt to restrict or burden the exercise of First Amendment rights must be narrowly drawn.[11] The difficult question is whether the statute should be stricken as overbroad or whether a court should rule only on the facts which are before it. The Court concluded by saying that "where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[12] 413

---

11. Specifically, statutes which have interfered with association rights have been stricken as overbroad. *See, e. g., Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

12. The Act does not directly regulate speech, but inhibits it by requiring organizations to report expenditures, thus deterring them from

participation in elections. The Act also inhibits individuals' First Amendment rights to freedom of association; this inhibition also impinges on free speech rights because individuals often "associate" for the very purpose of expressing their common views. The court assumes, without deciding, that this is a case where "conduct and not merely speech is involved." The "substantial overbreadth" doctrine has been applied

U.S. at 615, 93 S.Ct. at 2918. "It remains a 'matter of no little difficulty' to determine when a law may properly be held void on its face and when 'such summary action' is inappropriate." 413 U.S. at 615, 93 S.Ct. at 2917 (citation omitted).

Section 14–100(a) applies to the acts of plaintiff in supporting the ERA. This section on its face also would apply to every little Audubon Society chapter or Golden Age club or Boy Scout troop which campaigned for or against a particular referendum—to paraphrase the Second Circuit in *National Committee*. This court thinks it clear that the governmental interest in disclosure of both the contributors to and expenditures of essentially apolitical organizations such as these is minimal. On the other hand, the First Amendment right of freedom of association would suffer if potential contributors to these organizations declined to make "public" contributions. The First Amendment right of freedom of speech would suffer if these organizations were discouraged from actively engaging in an election campaign because of the disclosure and reporting requirements of the Act.

The court does not suggest that there are not circumstances under which an apparently a political organization must report receipts and expenditures. Such an organization might be a paper one in non-election years and serve as a conduit for political funds during an election. Or it might burgeon during election time to twice its normal size. Or it might receive anomalously large contributions expressly for political purposes. The constitutionality of applying Article 14 to these cases is not at issue here.

What is at issue is a statute which requires disclosure in *all* cases in which any amount of money is spent to support or oppose a referendum.

■■■■ We read the prior cases on campaign disclosure to require that disclosure can be constitutionally required only in those limited situations where the potential benefits of disclosure are so great as to outweigh the infringement on First Amendment rights. This court holds that that standard can be met by applying Article 14 only to those organizations soliciting contributions or making expenditures the major purpose of which is to support or to oppose any question submitted to vote at a public election.[13] The cases imply that this standard is constitutionally required. *Buckley, supra,* 424 U.S. at 61, 96 S.Ct. at 654 ("§ 434(e), if narrowly construed, . . . is within constitutional bounds."); *Buckley, supra,* 171 U.S.App.D.C. at 214 n. 112, 519 F.2d at 863 n. 112 (the federal statute without a limiting interpretation "would be open to constitutional attack on the grounds of vagueness, since it potentially reaches, for example, the activities of nonpartisan issue groups . . ."); *National Committee, supra,* 469 F.2d at 1140–41; *Jennings, supra,* 366 F.Supp. at 1056–57.

■■■ The court thus holds that as applied to questions submitted to vote at a public election, the specific issue before the court, § 14–100(a) is unconstitutional on the grounds of substantial overbreadth [14] since on its face it applies to certain groups in violation of their First Amendment rights.[15]

in *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (ordinance prohibiting showing of films containing nudity by drive-in movie theaters held unconstitutional); *Ward v. Illinois,* 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977) (in view of state court interpretation of obscenity statute, law held not substantially overbroad). *Broadrick* held that a state law prohibiting state employees from engaging in political activities was not substantially overbroad.

13. See footnote 6, *supra.*

14. Compare *Vanasco v. Schwartz,* 401 F.Supp. 87 (S.D.N.Y. 1975) (three judge court) *aff'd,* 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976) (§ 472(a) of the New York State Election Law and certain regulations promulgated thereunder held unconstitutionally overbroad by three-judge court).

15. This court need not reach the question of whether § 14–100(a) is unconstitutionally vague. Nor does the court express any opinion whether § 14–100(a) is constitutional as applied to activities other than the support of or opposition to a "question" submitted to the electorate at an election.

Plaintiff's motion for summary judgment is granted.

Submit order on notice.