65 F.3d 285
 FEDERAL ELECTION COMMISSION, Plaintiff-Counterdefendant-Appellant,
v.
SURVIVAL EDUCATION FUND, INC., and National Mobilization for
Survival, Inc., Defendants-Counterclaimants-Appellees.
 No. 431, Docket 94-6080.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 17, 1994.
Decided Sept. 12, 1995.
 
 Richard B. Bader, Associate General Counsel, Federal Election Commission, Washington, DC (Lawrence M. Noble, General Counsel, Vivien Clair, Staff Attorney, of counsel) for plaintiff-counterdefendant-appellant Federal Election Commission.
 Arthur N. Eisenberg, New York Civil Liberties Union Foundation, New York City (Catherine Samuels, Schulte, Roth, & Zabel, of counsel) for defendants-counterclaimants-appellees Survival Mobilization Fund, Inc. and National Mobilization for Survival, Inc.
 Before: OAKES, ALTIMARI, and WALKER, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 The major campaigns of the 1984 presidential election ended long ago, but some regulatory skirmishes remain to be fought in the election's aftermath. On January 17, 1989, the Federal Election Commission ("FEC") filed a civil law enforcement action against Survival Education Fund, Inc. ("SEF") and National Mobilization for Survival, Inc. ("NMS"). The FEC alleges first that SEF in 1984 violated a provision of the Federal Election Campaign Act ("FECA") prohibiting any corporation from using general treasury funds for express advocacy of the election or defeat of a clearly identified candidate for federal office, 2 U.S.C. Sec. 441b(a).[1] Second, the FEC contends that in 1984 SEF and NMS violated another FECA provision that requires any public mailing expressly advocating defeat or election of a candidate or soliciting a contribution to disclose who paid for the mailing and whether it was authorized by a candidate or his political committee, 2 U.S.C. Sec. 441d(a). All parties moved for summary judgment. The district court (Thomas P. Griesa, Chief Judge ) awarded summary judgment to SEF and NMS. The FEC appeals from that order.
 
 I. BACKGROUND
 
 2
 SEF is (and was at the time of the contested mailing) a nonprofit corporation organized under the laws of Massachusetts. Its articles of organization, filed in 1978, state the corporation's purposes in relevant part as "produc[ing] and disseminat[ing] on a free or low-cost basis educational information to the public regarding nuclear energy, alternative sources of energy, arms control and disarmament, military technology, and human services allocations." NMS was founded in 1977 as an unincorporated association engaging in public discussion and advocacy on similar issues. It became a New York nonprofit corporation in 1988 and ceased operations in 1992.
 
 
 3
 From February, 1982, to December, 1985, NMS conducted a direct mail campaign to promote its views to the public. SEF and NMS jointly financed the mailing at issue in this case and sent it out to nearly 31,000 members of the general public between July 23 and 27, 1984. SEF paid its share of the costs out of its general corporate treasury funds.
 
 
 4
 That mailing included a cover letter signed by Dr. Benjamin Spock and a two-page enclosure. The cover letter (with underlining in the original) read in its entirety:
 
 DEAR FRIEND:
 
 5
 I NEED YOUR HELP.
 
 
 6
 IT IS URGENT FOR YOU TO FILL OUT THE ENCLOSED SURVEY AND RESPOND TO THIS MESSAGE AS SOON AS POSSIBLE ... AS A PERSONAL FAVOR TO ME, AND FOR THE FUTURE OF OUR COUNTRY.
 
 
 7
 AS THE NOVEMBER PRESIDENTIAL ELECTION APPROACHES, NATIONAL MOBILIZATION FOR SURVIVAL NEEDS TO KNOW YOUR OPINIONS ON WHETHER FOUR MORE YEARS OF THE REAGAN ADMINISTRATION'S MILITARY, FOREIGN, AND DOMESTIC POLICIES WILL DESTROY ALL HOPE FOR NUCLEAR DISARMAMENT, PEACE ABROAD, AND ECONOMIC JUSTICE HERE AT HOME.
 
 
 8
 MILLIONS OF AMERICANS--NOT JUST YOU AND ME--ARE BEGINNING TO BELIEVE THAT WE CANNOT ALLOW THAT TO HAPPEN. YOUR VIEWS ON THE ENCLOSED SURVEY WILL HELP US UNDERSTAND AND ARTICULATE THE DEEP FEARS OF THE AMERICAN PEOPLE THAT A SECOND REAGAN TERM WILL BRING NEW AND UNCHECKED NUCLEAR ARMS ESCALATION ... AN ALL-OUT U.S. WAR IN CENTRAL AMERICA ... AND EVEN MORE LIFE-THREATENING CUTS IN HUMAN SERVICES.
 
 
 9
 THIS SURVEY IS PART OF NATIONAL MOBILIZATION'S CONCERTED GRASSROOTS EFFORT, WORKING WITH OTHER ORGANIZATIONS, TO EDUCATE AMERICANS WHO WILL BE VOTING IN NOVEMBER TO VOTE PEACE IN '84, THROUGH VOTER REGISTRATION AND CITIZENSHIP-AWARENESS CAMPAIGNS AMONG HUNDREDS OF LOCAL GROUPS ACROSS THE COUNTRY.
 
 
 10
 THE CAMPAIGN IS KICKING OFF IN DALLAS. BY THE TIME YOU READ THIS, OUR HIGHLY VISIBLE PRESENCE AT THE REPUBLICAN PARTY'S NOMINATING CONVENTION--MAJOR PROTEST EVENTS INVOLVING THOUSANDS OF WOMEN AND MEN FROM ACROSS THE COUNTRY--MAY WELL BE OVER.
 
 
 11
 BUT DALLAS IS ONLY THE BEGINNING. WE'RE GOING TO BE HOLDING ANTI-NUCLEAR DEMONSTRATIONS AND VIGILS, CONFRONTING CANDIDATES ON MILITARY-NUCLEAR ISSUES, ORGANIZING POOR AND MINORITY VOTER REGISTRATION DRIVES, AND DRAMATIZING THE SUFFERING OF THE VICTIMS OF REAGANOMICS RIGHT UP TO ELECTION DAY, NOVEMBER 6TH.
 
 
 12
 FUNDS ARE URGENTLY NEEDED TO HELP DEFRAY THE ENORMOUS COST OF MOUNTING, ORGANIZING, PUBLICIZING AND COORDINATING THIS NATIONWIDE EFFORT. ALL THAT MILLIONS OF AMERICANS NEED ARE THE FACTS WE CAN PROVIDE TO DETERMINE FOR THEMSELVES WHAT DANGERS AWAIT OUR NATION UNDER FOUR MORE YEARS OF REAGAN LEADERSHIP.
 
 
 13
 YOUR RESPONSES TO THE ENCLOSED SURVEY WILL TELL US WHAT POLITICALLY-AND-SOCIALLY AWARE AMERICANS ARE THINKING AS NOVEMBER'S CRUCIAL DECISION DAY DRAWS NEAR AND YOUR SPECIAL ELECTION-YEAR CONTRIBUTION WILL HELP US COMMUNICATE YOUR VIEWS TO HUNDREDS OF THOUSANDS OF MEMBERS OF THE VOTING PUBLIC, LETTING THEM KNOW WHY RONALD REAGAN AND HIS ANTI-PEOPLE POLICIES MUST BE STOPPED.
 
 
 14
 SO, PLEASE, RETURN YOUR SURVEY AND YOUR CHECK IMMEDIATELY. ANYTHING YOU CAN GIVE AT THIS TIME--$50, $100, $25, $500, $1,000, $2,500 OR MORE--WILL HELP US REACH MORE PEOPLE, AND INCREASE THE EFFECTIVENESS OF OUR ELECTION-YEAR WORK.
 
 
 15
 THANK YOU FOR YOUR DEEP DEDICATION AND COMMITMENT.
 
 
 16
 BENJAMIN SPOCK, M.D.
 
 
 17
 The enclosure had a headline banner in bold type that read: HELP US SPREAD THE WORD: VOTE PEACE IN '84.
 
 
 18
 In the upper right-hand corner of the first page of the enclosure was a solicitation for contributions that read, "YES, Americans who will be voting in November need to know the facts about how four more years of Reagan leadership will affect our nation and the world. Here is my contribution ... to help bring the message of nuclear disarmament, nonintervention, and economic justice to the voting public between now and November 1." The rest of the enclosure posed eight questions as part of a "1984 ELECTION SURVEY[;] RONALD REAGAN: FOUR MORE YEARS?" The questions solicited the views of the recipients on the effect of a second Reagan term on nuclear armaments, U.S. intervention in Central America, and the status of the poor and minorities in this country.
 
 
 19
 On the cross-motions for summary judgment, the district court held that this mailing, and another not the subject of this appeal, violated neither 2 U.S.C. Sec. 441b(a) nor 2 U.S.C. Sec. 441d(a)(3). The district court noted that the Supreme Court had narrowed Sec. 441b(a), which by its terms prohibits the use of general corporate treasury funds "in connection" with a federal election, 2 U.S.C. Sec. 441b(a), to reach
 
 
 20
 "only communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 248-49 [107 S.Ct. 616, 623, 93 L.Ed.2d 539] (1986) ("MCFL "), quoting Buckley v. Valeo, 424 U.S. 1, 80 [96 S.Ct. 612, 664, 46 L.Ed.2d 659] (1976). This means the use of express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot," "Smith for Congress," "vote against," "defeat," "reject." MCFL at 249 [107 S.Ct. at 623].
 
 
 21
 Federal Election Comm'n v. Survival Educ. Fund, No. 89 Civ. 0347, 1994 WL 9658, at * 3 (S.D.N.Y. Jan. 12, 1994) (citations omitted). Noting that the " 'express advocacy' " requirement is intended to " 'distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons,' " id. (quoting Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 249, 107 S.Ct. 616, 623, 93 L.Ed.2d 539 (1986) ("MCFL ")), the district court held that the SEF/NMS mailing "fell short of expressly advocating how the readers should vote in the coming presidential election." Id. Therefore, it granted summary judgment to the defendants on the FEC's Sec. 441b(a) claim. Id. Since, in its view, no express advocacy occurred in the mailing, the district court also granted summary judgment to defendants on the FEC's claim that SEF and NMS failed to comply with the disclosure requirements of 2 U.S.C. Sec. 441d(a)(3). The FEC appeals from the district court's judgment dismissing both claims. We review a grant of summary judgment de novo. Himes v. Shalala, 999 F.2d 684, 688 (2d Cir.1993).
 
 II. DISCUSSION
 A. The FEC's Claim Under 2 U.S.C. Sec. 441b
 
 22
 Section 316 of FECA, 2 U.S.C. Sec. 441b, makes it unlawful "for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any" federal election. 2 U.S.C. Sec. 441b(a). The term "contribution or expenditure" includes "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value ... to any candidate, campaign committee, or political party or organization, in connection with" any federal election. Id. Sec. 441b(b)(2). The statute exempts three types of expenditures: (A) communications by a corporation to its stockholders, executive or administrative personnel, or their families, or by a labor organization to its members, on any subject; (B) nonpartisan voter registration and participation campaigns directed at those same persons; and (C) "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes...." Id. That segregated fund may only consist of contributions solicited from the corporation's stockholders, executive and administrative personnel, and employees (or the families of those persons) under conditions specified by the statute. See id. Sec. 441b(b)(2)(C), (b)(4)(A)(i), (b)(4)(B).
 
 
 23
 As the district court correctly noted, the Supreme Court has held that Sec. 441b reaches only corporate speech that "expressly advocates" the election or defeat of a clearly identified candidate for federal office. MCFL, 479 U.S. at 249, 107 S.Ct. at 623. However, we do not address the question whether SEF's and NMS's July, 1984 mailing constituted express advocacy of Ronald Reagan's defeat in the impending presidential election. We affirm the order granting summary judgment to SEF on FEC's Sec. 441b claim on a ground not relied upon by the district court, but argued by SEF both below and on appeal, cf. Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970) ("The prevailing party may, of course, assert in any reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court."): namely, that Sec. 441b(a) cannot constitutionally be applied to burden any speech, whether express advocacy or not, by a nonprofit political advocacy corporation like SEF which is independent of corporate and labor interests.[2]
 
 
 24
 Expenditures on political advocacy "constitute expression ' "at the core of our electoral process and of the First Amendment freedoms." ' " MCFL, 479 U.S. at 251, 107 S.Ct. at 624 (Brennan, J.) (quoting Buckley v. Valeo, 424 U.S. 1, 39, 96 S.Ct. 612, 644, 46 L.Ed.2d 659 (1976) (quoting Williams v. Rhodes, 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968))). In MCFL, the Supreme Court found that the strictures placed on corporate political expression by Sec. 441b and related provisions of FECA burdened protected speech. See id. at 254-56, 107 S.Ct. at 625-27 (Brennan, J.) (expressing plurality opinion that costs of administering segregated fund and extensive disclosure requirements burdened speech); id. at 266, 107 S.Ct. at 632 (O'Connor, J.) (writing separately to say that burden derived from organizational restraints placed on corporations by FECA, not disclosure requirements).
 
 
 25
 The Court nonetheless discerned a compelling state interest justifying the burden placed on corporate political expression: limiting "the corrosive influence of concentrated corporate wealth" on the political system. Id. at 257, 107 S.Ct. at 627. The wealth amassed in a corporate treasury threatens to distort the market in political ideas, since it makes the corporation a "formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas." Id. at 258, 107 S.Ct. at 628. In a subsequent case concerning a state law that paralleled FECA in its restrictions on corporate speech, the Court emphasized that regulation of corporate electoral expenditures is not justified by the fact of wealth alone, but by the "unique state-conferred corporate structure that facilitates the amassing of large treasuries," Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 660, 110 S.Ct. 1391, 1398, 108 L.Ed.2d 652 (1990), comprised of features such as "limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets," id. at 658-659, 110 S.Ct. at 1397.
 
 
 26
 Not all corporations can constitutionally be subjected to FECA's strictures. The government interest in regulating corporate electoral activity relates not to the "use of the corporate form per se, but ... the potential for unfair deployment of wealth for political purposes." MCFL, 479 U.S. at 259, 107 S.Ct. at 628. In MCFL, the Court held that FECA could not constitutionally be applied to Massachusetts Citizens for Life ("MCFL"), a nonprofit corporation formed for antiabortion advocacy which was "more akin to voluntary political associations than business firms." Id. at 263, 107 S.Ct. at 631.
 
 
 27
 Groups such as MCFL ... do not pose th[e] danger of corruption [business corporations do]. MCFL was formed to disseminate political ideas, not to amass capital. The resources it has available are not a function of its success in the economic marketplace, but its popularity in the political marketplace. While MCFL may derive some advantage from its corporate form, those are advantages that redound to its benefit as a political organization, not as a profitmaking enterprise. In short, MCFL is not the type of traditional corporation organized for economic gain that has been the focus of regulation of corporate political activity.
 
 
 28
 Id. at 259, 107 S.Ct. at 628 (quotations and citations omitted).
 
 
 29
 The simple fact that a corporation is nonprofit and engaged in political advocacy does not exempt it from limitations on campaign spending, however. In Austin, the Supreme Court held that a state law proscribing independent corporate political expenditures could constitutionally be applied to the nonprofit Michigan Chamber of Commerce ("the Chamber"), which represented business interests. See 494 U.S. at 661-65, 110 S.Ct. at 1398-1400. In distinguishing the Chamber from the pro-life corporation MCFL, the Court in Austin described three characteristics of MCFL that were " 'essential' " to the Court's holding that Sec. 441b could not constitutionally be applied to MCFL. Id. at 662, 110 S.Ct. at 1398-99 (quoting MCFL, 479 U.S. at 263, 107 S.Ct. at 630-31). First, MCFL " 'was formed for the express purpose of promoting political ideas, and [could] not engage in business activities,' " id. (quoting MCFL, 479 U.S. at 264, 107 S.Ct. at 631), whereas the bylaws of the Chamber set forth more varied purposes, including some related to the business and economic interests of its members. Id. Second, MCFL had no " 'shareholders or other persons affiliated so as to have a claim on its assets or earnings,' " thereby ensuring " 'that persons connected with the organization [would] have no economic disincentive for disassociating with it if they disagree[d] with its political activity.' " Id. at 663, 110 S.Ct. at 1399 (quoting MCFL, 479 U.S. at 264, 107 S.Ct. at 631). The Chamber, by contrast, provided valuable nonpolitical programs that would deter members from leaving the Chamber even if they found its political advocacy unpalatable. Third, MCFL was "independen[t] from the influence of business corporations." Id. at 664, 110 S.Ct. at 1400. MCFL had not been established by a business corporation or labor union, and it had an express policy against accepting contributions from such entities. MCFL, 479 U.S. at 264, 107 S.Ct. at 631. Thus, unlike the Chamber, it could not " 'serv[e] as [a] condui[t] for the type of direct spending that creates a threat to the political marketplace.' " Austin, 494 U.S. at 664, 110 S.Ct. at 1400 (quoting MCFL, 479 U.S. at 264, 107 S.Ct. at 631) (brackets in original).
 
 
 30
 SEF contends that it resembles MCFL with respect to all three factors, and therefore deserves the same constitutional exemption: (1) it was formed solely for the purpose of political advocacy and education; (2) it has no members or shareholders with an economic disincentive to dissociate with SEF if they disagree with its political advocacy; and (3) it is independent from corporate influence.
 
 
 31
 The FEC concedes that the first two MCFL factors weigh in SEF's favor, but argues that SEF lacks the essential indicium of independence from corporate or labor influence that distinguished the pro-life corporation in MCFL from the chamber of commerce in Austin: an express policy against accepting contributions from corporations or labor unions. The FEC argues that the Supreme Court intended the three MCFL factors to be read narrowly, thereby exempting only a "small" class of corporations from the statute. See MCFL, 479 U.S. at 264, 107 S.Ct. at 631. The FEC also places great weight on the Supreme Court's observation that "it is the potential for [corporate] influence that demands regulation," not the fact of whether a corporation has amassed wealth. Austin, 494 U.S. at 661, 110 S.Ct. at 1398 (quotations and citation omitted). In the FEC's view, only an absolute policy against accepting contributions from business corporations and labor unions would guarantee that a nonprofit group like SEF would not abuse its corporate form. The FEC notes finally that two lower courts have adopted its position. See Federal Election Comm'n v. NRA Political Victory Fund, 778 F.Supp. 62, 64 (D.D.C.1991), rev'd on other grounds, 6 F.3d 821 (D.C.Cir.1993), cert. dismissed, --- U.S. ----, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994); Faucher v. Federal Election Comm'n, 743 F.Supp. 64, 69 (D.Me.1990), aff'd, 928 F.2d 468 (1st Cir.), cert. denied, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).
 
 
 32
 We think the FEC misunderstands the nature of MCFL and Austin. Both decisions involve as-applied First Amendment challenges to election laws. The Court's listing of the factors essential to its holding on the facts of a particular case does not impose a code of compliance that other nonprofit corporations must follow to the letter. The Eighth Circuit recognized this in a recent case concerning a Minnesota election law that codified the three MCFL factors as the conditions for exemption from a statute limiting corporate political expenditures. Day v. Holahan, 34 F.3d 1356 (8th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995). The court held that the exemption was too limited, and that the corporate expenditures statute could not constitutionally be applied to a nonprofit organization that did not "receive any significant contributions from for-profit corporations" even though it had no declared policy against receiving such contributions. Id. at 1364-65. It reasoned that the
 
 
 33
 analysis in MCFL ... is not a constitutional test for when a nonprofit corporation must be exempt. Instead it is an application, in three parts, of First Amendment jurisprudence to the facts in MCFL. The state goes too far in concluding that the factual findings of MCFL translate into absolutes in legal application.
 
 
 34
 Id. at 1363. To address the core concerns of MCFL, a court should focus upon "the amount of for-profit corporate funding a nonprofit receives, rather than the establishment of a policy not to accept significant amounts." Id. at 1364.
 
 
 35
 We agree with the analysis in Day. The rigidity with which the FEC would have us apply MCFL would impoverish political debate. As the Court in MCFL recognized, organizational speech is a vital means of amplifying the citizen's voice in a democracy: "individuals contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction." 479 U.S. at 261, 107 S.Ct. at 629; see also Buckley, 424 U.S. at 65, 96 S.Ct. at 657 ("[G]roup association is protected because it enhances '[e]ffective advocacy.' ") (quoting NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958)). The only concern that justifies application of Sec. 441b to nonprofit political advocacy corporations is the prospect that business firms or labor unions would funnel their wealth, which derives from the commercial marketplace, into the political marketplace of ideas. To be sure, an express policy against accepting corporate or union contributions is clear proof that no such danger exists, as the Court in MCFL duly found. 479 U.S. at 264, 107 S.Ct. at 631. But a nonprofit political advocacy corporation, which in fact receives no significant funding from unions or business corporations, does not surrender its First Amendment freedoms for the want of such a policy.
 
 
 36
 Under MCFL, a nonprofit political advocacy corporation having no shareholders or members with financial disincentives to disassociate from the corporation if they disagree with its views is exempt from Sec. 441b as long as it is independent in fact from significant business or labor influence. The existence of a policy against accepting contributions from business corporations or unions is relevant to, but not dispositive of, the issue of independence.
 
 
 37
 There exists no genuine issue of material fact as to SEF's independence. The record in this case includes an affidavit from Anthony A. Palomba, President of the Board of SEF, stating that SEF was neither organized by nor affiliated with corporations or labor unions. That affidavit and the Local Rule 3(g) Statement of Material Facts Not in Dispute filed by SEF in the district court also indicate that SEF received less than one percent of its total revenues in both 1983 and 1984 from corporations. The FEC does not contest that assertion, nor does it make any allegation or showing that SEF was under the influence of corporations or labor unions in any material way in those years. In light of this evidence, we hold that SEF was exempt from the application of Sec. 441b at the time of the July, 1984 mailing, and therefore affirm the summary judgment in favor of SEF on the FEC's Sec. 441b claim.
 
 
 38
 B. FEC's Claim Under 2 U.S.C. Sec. 441d(a)(3)
 
 
 39
 FECA requires that "any person" who makes an expenditure to finance a "direct mailing" that either "expressly advocat[es] the election or defeat of a clearly identified candidate" or "solicits any contribution" must include a specified notice in the communication. 2 U.S.C. Sec. 441d(a). The term "person" includes, inter alia, an association, corporation, or "any other organization or group of persons" outside of the federal government. Id. Sec. 431(11). A contribution is defined, for purposes relevant here, as "any gift ... or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." Id. Sec. 431(8)(A)(i). If the mailing is authorized or paid for by a candidate, his political committee, or agents, or authorized by such persons but paid for by others, the mailing must clearly state who authorized and paid for it. Id. Sec. 441d(a)(1)-(2). If the mailing is not authorized by a candidate, his political committee, or agents, the notice must "clearly state the name of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee." Id. Sec. 441d(a)(3).
 
 
 40
 The FEC alleges in its complaint that both SEF and NMS violated Sec. 441d(a)(3) because the July, 1984 mailing omitted the requisite disclosures. The district court granted summary judgment to SEF and NMS on the grounds that Sec. 441d(a)(3) only applies to communications that expressly advocate the election or defeat of a clearly identified candidate for federal office.
 
 
 41
 We cannot accept the district court's construction of the statute. Section 441d(a) by its terms imposes a disclosure requirement upon any person who makes such communications "or solicits any contribution" through some form of publication. Id. Sec. 441d(a) (emphasis added). By statutory amendment in 1979, Congress specifically extended Sec. 441d(a), which previously applied only to communications containing express advocacy, to solicitations for contributions. Federal Election Campaign Act Amendments of 1979, Pub.L. No. 96-187, Sec. 111, 93 Stat. 1339, 1365-66 (1980). While the district court's construction would have been proper as applied to the pre-amendment version of the statute, see Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm., 616 F.2d 45, 53 (2d Cir.1980) (in banc) (per curiam) (holding that a 1976 bulletin from a tax reform group which included a solicitation for donations was exempt from Sec. 441d since it did not contain express advocacy), it is no longer tenable. Cf. Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979) (declaring as an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative"). The issues now before us are whether a solicitation of contributions "for the purpose of influencing any election for Federal office," 2 U.S.C. Sec. 431(8)(A)(i), encompasses the solicitation made here, and, if so, whether the Sec. 441d(a) disclosure requirements would be constitutionally infirm as applied to SEF and NMS.
 
 
 42
 We have confronted before the "made ... for the purpose of influencing any election" language used in FECA to define both "contributions," see id. Sec. 431(8)(A)(i), and "expenditures," see id. Sec. 431(9)(A)(i). In United States v. National Committee for Impeachment, 469 F.2d 1135 (2d Cir.1972) ("Impeachment "), the government had obtained a preliminary injunction enjoining a committee favoring the impeachment of Richard Nixon from accepting contributions or disbursing funds until it met the disclosure and reporting requirements of FECA. Lest any movement dealing with national policy be subjected to the onerous requirements devised to police political campaigns, a result we refused to believe Congress intended, see id. at 1141-42, we interpreted that language narrowly:
 
 
 43
 We ... construe the words "made for the purpose of influencing" in Section 301(e) [ (defining "contribution") ] and (f) [ (defining "expenditure") ] to mean an expenditure made with the authorization or consent, express or implied, or under the control, direct or indirect, of a candidate or his agents.... We also construe the Act to apply only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates.
 
 
 44
 Id. at 1141.
 
 
 45
 After Impeachment was decided, however, the Supreme Court in Buckley gave a broader reading to the phrase "made for the purpose of influencing" any federal election. The Court noted first that "[t]he use of the phrase presents fewer problems in connection with the definition of a contribution [than with the definition of an expenditure] because of the limiting connotation created by the general understanding of what constitutes a political contribution." Buckley, 424 U.S. at 23-24 n. 24, 96 S.Ct. at 637 n. 24 (discussing definitions in 18 U.S.C. Sec. 591(e), (f) (Supp. IV 1970), which the Court interpreted as identical to 2 U.S.C. Sec. 431(e) and (f) (Supp. IV 1970), see Buckley, 424 U.S. at 78, 96 S.Ct. at 663, the precursors to the current 2 U.S.C. Sec. 431(8)(A)(i) and (9)(A)(i)). The Court then identified three types of contributions or expenditures "made for the purpose of influencing elections" that were properly covered by FECA: (1) "contributions made directly or indirectly to a candidate, political party, or campaign committee"; (2) "contributions made to other organizations or individuals but earmarked for political purposes"; and (3) "expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate." Buckley, 424 U.S. at 78, 96 S.Ct. at 663. While Impeachment may fairly be read to have treated only the first and third categories of contributions as covered by FECA, Buckley also includes certain contributions to organizations operating wholly independent of any candidate if they are "earmarked for political purposes." Id.
 
 
 46
 The FEC argues that the contributions solicited by SEF and NMS fall neatly within the second category of contributions identified in Buckley, and thus the solicitation was subject to the disclosure requirements of Sec. 441d(a)(3). Before we decide that point, however, we must give content to the phrase "earmarked for political purposes" which is used but not explained in Buckley. As defendants point out, groups like SEF and NMS rely on contributions as the lifeblood of their issue-advocacy activities. Because these groups in some sense use all contributions "for political purposes," they contend that they will be at a loss to know when a solicitation triggers FECA disclosure requirements and subjects them to potential civil penalties. Cf. 2 U.S.C. Sec. 437g(a)(6)(B) (a court, upon proper showing of violation of FECA, may impose "a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation"). This uncertainty, defendants argue, burdens their general solicitation activity, which is protected by the First Amendment. See Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).
 
 
 47
 We think the hazards of uncertainty feared by defendants can be avoided. The only contributions "earmarked for political purposes" with which the Buckley Court appears to have been concerned are those that will be converted to expenditures subject to regulation under FECA. Thus, Buckley 's definition of independent expenditures that are properly within the purview of FECA provides a limiting principle for the definition of contributions in Sec. 431(8)(A)(i), as applied to groups acting independently of any candidate or his agents and which are not "political committees" under FECA, cf. Buckley, 424 U.S. at 79, 96 S.Ct. at 663 (suggesting a narrow construction of "political committee" as encompassing only those organizations "under the control of a candidate or the major purpose of which is the nomination or election of a candidate.") (footnote omitted). Accordingly, disclosure is only required under Sec. 441d(a)(3) for solicitations of contributions that are earmarked for activities or "communications that expressly advocate the election or defeat of a clearly identified candidate," Buckley, 424 U.S. at 80, 96 S.Ct. at 664 (footnote omitted). Even if a communication does not itself constitute express advocacy, it may still fall within the reach of Sec. 441d(a) if it contains solicitations clearly indicating that the contributions will be targeted to the election or defeat of a clearly identified candidate for federal office.
 
 
 48
 This interpretation limits the application of Sec. 441d(a) to Congress's core purpose: namely, promoting fair and open electoral competition by informing the public whether ostensibly unaffiliated organizations taking positions in an election or beseeching contributions from the public are doing so at the behest of candidates. It also gives clear guidance to issue-advocacy groups. They may take positions favorable or unfavorable to different candidates, and may solicit contributions to promulgate their views to the public, even for the purpose of applauding or criticizing candidates during an election campaign. Only if the solicitation makes plain that the contributions will be used to advocate the defeat or success of a clearly identified candidate at the polls are they obliged to disclose that the solicitation was authorized by a candidate or his committee.
 
 
 49
 The July, 1984 mailing was a solicitation of contributions within the meaning of Sec. 441d(a), as we construe that section. The cover letter from Dr. Spock stated that "your special election-year contribution today will help us communicate your views to hundreds of thousands of members of the voting public, letting them know why Ronald Reagan and his anti-people policies must be stopped" (first emphasis added). That statement leaves no doubt that the funds contributed would be used to advocate President Reagan's defeat at the polls, not simply to criticize his policies during the election year. By omitting the requisite disclosures, SEF and NMS violated Sec. 441d(a)(3).
 
 
 50
 Contrary to the defendants' assertions, the application of the minimal disclosure requirements of Sec. 441d(a)(3) to their solicitation is not constitutionally infirm. We recognize that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Buckley, 424 U.S. at 64, 96 S.Ct. at 656; see also Brown v. Socialist Workers '74 Campaign Comm. (Ohio), 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (holding that First Amendment prohibits a state from compelling disclosures by a minor political party that would subject those persons to the reasonable probability of threats, harassment, or reprisals); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). The Supreme Court, however, upheld an even more far-reaching disclosure provision in Buckley. Under 2 U.S.C. Sec. 434(e) (Supp. IV 1970), the predecessor to the current 2 U.S.C. Sec. 434(c)(1),
 
 
 51
 "[e]very person (other than a political committee or candidate) who makes contributions or expenditures" aggregating over $100 in a calendar year "other than by contribution to a political committee or candidate" [must] file a statement with the Commission. Unlike the other disclosure provisions, this section does not seek the contribution list of any association. Instead, it requires direct disclosure of what an individual or group contributes or spends.
 
 
 52
 Buckley, 424 U.S. at 74-75, 96 S.Ct. at 661 (quoting 2 U.S.C. Sec. 434(e) (Supp. IV 1970) (footnote omitted)). To avoid vagueness concerns, the Supreme Court construed Sec. 434(e) to
 
 
 53
 impose[ ] independent reporting requirements on individuals and groups that are not candidates or political committees only in the following circumstances: (1) when they make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.
 
 
 54
 Id. at 80, 96 S.Ct. at 664. The Court proceeded to hold that Sec. 434(e), so narrowed, passed constitutional muster as "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view." Id. at 82, 96 S.Ct. at 664.
 
 
 55
 Section 441d(a)(3), unlike the former Sec. 434(e), does not require "direct disclosure of what an individual or group contributes or spends," id. at 75, 96 S.Ct. at 661, but only disclosure of who paid for the particular communication at issue and that it was not authorized by a candidate or his agents. If one hundred dollars' worth of expenditures "expressly advocat[ing] the election or defeat of a clearly identified candidate," id. at 80, 96 S.Ct. at 664, could trigger the broad disclosure obligations of the former Sec. 434(e) without offending the Constitution, we see no reason why a solicitation of contributions to make such expenditures cannot constitutionally subject a person to the more limited disclosure obligations of Sec. 441d(a)(3).
 
 
 56
 Like the former Sec. 434(e), Sec. 441d(a)(3) serves important First Amendment values. Potential contributors are entitled to know that they are supporting independent critics of a candidate and not a group that may be in league with that candidate's opponent. Section 441d(a)(3) is thus "a reasonable and minimally restrictive method," Buckley, 424 U.S. at 82, 96 S.Ct. at 664, of ensuring open electoral competition that does not unduly trench upon defendants' First Amendment rights.
 
 
 57
 We note finally that the application of Sec. 441d(a)(3) to SEF and NMS does not run afoul of the Supreme Court's recent decision in McIntyre v. Ohio Elections Commission, --- U.S. ----, ---- - ----, 115 S.Ct. 1511, 1516-17, 131 L.Ed.2d 426 (1995). McIntyre ruled unconstitutional a state law banning the distribution of anonymous campaign literature. In so holding the Court stated that "Ohio [had] not shown that its interest in preventing the misuse of anonymous election-related speech justifie[d] a prohibition of all uses of that speech." Id. at ----, 115 S.Ct. at 1524. We conclude, however, that the government's interest in regulating the solicitation of donations is sufficiently great to justify Sec. 441d(a)(3) in the face of a constitutional challenge.
 
 
 58
 Section 441d(a)(3) regulates two different types of political communication: both (i) "mak[ing] an expenditure for the purpose of ... expressly advocating the election or defeat of a clearly identified candidate" and (ii) "solicit[ing] any contribution." 2 U.S.C. Sec. 441d(a). But only the second category concerns us in this case. Whatever the effect of McIntyre on the constitutionality of category (i) political advertising (an issue we do not address), the issue before us is solely whether requiring a disclosure by a group that is soliciting a contribution runs afoul of the First Amendment.
 
 
 59
 At the outset, we note that the regulation of solicitation under Sec. 441d(a)(3) is severable from the regulation of advocacy, so we need not pass on the constitutionality of that entire provision. The severability provision in FECA, 2 U.S.C. Sec. 454, states that "[i]f any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the validity of the remainder of the Act and the application of such provision to other persons and circumstances shall not be affected thereby." The Supreme Court has held that such a clause creates a presumption in favor of severability. Alaska Airlines v. Brock, 480 U.S. 678, 686, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987). Indeed, the Court has previously severed invalid portions of the FECA from the statute. See, e.g., Buckley, 424 U.S. at 108-09, 96 S.Ct. at 677-78. Thus, we confine ourselves solely to the constitutionality of the requirement that solicitations for contributions disclose who paid for them and whether or not they were authorized by a candidate or the candidate's committee.
 
 
 60
 In McIntyre, the Supreme Court reiterated that "[w]hen a law burdens core political speech," the law should be upheld "only if it is narrowly tailored to serve an overriding state interest." McIntyre, --- U.S. at ----, 115 S.Ct. at 1519. We note, though, that the Supreme Court has been far more willing to uphold the regulation of contributions than to allow the restrictions of handbilling or other direct political speech. For instance, the Supreme Court has consistently recognized that limitations on contributions stand on firmer constitutional grounds than limitations on individual expenditures. See MCFL, 479 U.S. at 259-60, 107 S.Ct. at 628-29; Buckley, 424 U.S. at 20-22, 96 S.Ct. at 635-36. Similarly, the Court has upheld significant restrictions under Sec. 441b on contributions made to separate segregated funds. See FEC v. National Right to Work Comm., 459 U.S. 197, 206-11, 103 S.Ct. 552, 558-61, 74 L.Ed.2d 364 (1982).
 
 
 61
 Contrary to SEF and NMS's contentions, Sec. 441d(a)(3) does not serve only the interest of monitoring compliance with the FECA's general campaign contribution limitations. As we noted above, the government also has an interest in ensuring that contributors know whether they are donating their money directly to a candidate or, instead, to independent critics of another candidate, so that they are not misled into giving money to candidates or causes they do not support. See MCFL, 479 U.S. at 261, 107 S.Ct. at 629-30 (stating that Congress may require that contributors be informed that their donations will be used to support or oppose candidates solely on the basis of one issue).
 
 
 62
 McIntyre 's holding that simply informing the electorate is not a sufficiently compelling interest to justify a ban on anonymous campaign literature, --- U.S. at ---- - ----, 115 S.Ct. at 1519-20, was based on the premise that "the interest in informing the electorate means nothing more than the provision of additional information that may either buttress or undermine the argument in a document." Id. at ----, 115 S.Ct. at 1519. In this case, however, the government's interest in identifying who paid for a solicitation letter and whether the candidate authorized the letter goes significantly further: by avoiding any misunderstanding as to the actual recipient of the solicited contribution, Sec. 441d(a)(3) enables the solicitee to contribute money to those groups which truly reflect his or her beliefs. This is the sort of critical information that protects the integrity of the electoral process.
 
 
 63
 Section 441d(a)(3) serves other interests as well. By requiring disclosure of who has paid for the solicitation and that it is not being made on behalf of a candidate, the statute deters clandestine corruption of candidates, an interest that the Supreme Court has repeatedly found compelling. See McIntyre, --- U.S. at ----, 115 S.Ct. at 1523; Buckley, 424 U.S. at 67, 96 S.Ct. at 657-58. Moreover, Sec. 441d(a) helps to ensure that private citizens, in responding to a solicitation, do not unintentionally violate FECA's contribution limitations. See Buckley, 424 U.S. at 67, 96 S.Ct. at 657-58; see also McIntyre, --- U.S. at ---- - ----, 115 S.Ct. at 1523-24 (stating that Congress has a legitimate interest in ensuring that campaign organizations do not evade disclosure requirements through individual supporters). The foregoing interests are sufficiently compelling to justify Sec. 441d(a)(3). The interests of the federal government in regulating the solicitation of contributions by general public political advertising, where the appellees were seeking to acquire funds from the electorate, are therefore substantially greater than Ohio's interests in regulating anonymous handbills, where Ms. McIntyre was seeking only agreement by the electorate for her views.
 
 
 64
 We also find that Sec. 441d(a)(3) is narrowly tailored to serve these interests. The disclosures required by Sec. 441d(a)(3) are quite minimal: "the name of the person who paid for the communication" and a statement "that the communication is not authorized by any candidate or candidate's committee." In addition, Sec. 441d(a) applies only to certain, specified forms of contact with voters: "broadcasting station, newspaper, magazine, outdoor advertisement facility, direct mailing, or any other type of general public political advertising." There is no requirement that the party actually distributing the solicitation name itself (unless it paid for the solicitation), nor is there any requirement that the party's address be included. 2 U.S.C. Sec. 441d(a)(3). Furthermore, our interpretation of Sec. 441d(a) limits its reach only to solicitations that target the election or defeat of a clearly identified federal candidate. Thus, the requirements of Sec. 441d(a)(3) are far more narrowly tailored than those of the Ohio statute in McIntyre, --- U.S. at ---- - ---- n. 3, 115 S.Ct. at 1514-15 n. 3.
 
 
 65
 Justice Stevens' opinion in McIntyre noted that even Ohio's lesser interests in that legislation "might justify a more limited identification requirement." Id. at ----, 115 S.Ct. at 1522. Because the government in this case has more compelling interests than did Ohio in McIntyre and because Sec. 441d(a)(3) is more narrowly tailored to those interests than the statute in McIntyre, we have no difficulty finding that Sec. 441d(a)(3) is constitutional as applied. See also Common Cause v. FEC, 842 F.2d 436, 444-45 (D.C.Cir.1988) ("[Section] 441d(a) was itself carefully crafted to accommodate the competing interests of voter information and free political speech.").
 
 
 66
 Since there are no material issues of fact for the trier of fact to resolve, we instruct the district court to award summary judgment to the FEC on its claim under 2 U.S.C. Sec. 441d(a)(3).
 
 III. CONCLUSION
 
 67
 The district court's order of summary judgment on the FEC's claim under 2 U.S.C. Sec. 441b is affirmed. The order is reversed as to the FEC's claim under 2 U.S.C. Sec. 441d(a)(3), and the district court is instructed to enter summary judgment in favor of the FEC. The case is remanded for a determination of the appropriate relief for the FEC on its Sec. 441d(a)(3) claim.
 
 
 68
 OAKES, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 69
 While I concur in Part A of the majority's opinion, I am unable to concur in Part B as I do not believe the "solicits any contribution" clause of Sec. 441d(a) provides a constitutionally adequate means of reaching these defendants.
 
 
 70
 The majority purports to avoid the primary, and quite difficult, question briefed by the parties--whether defendants' July 1984 mailing constitutes express electoral advocacy and so falls under the first prong of Sec. 441d(a), covering "expenditures for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate." The majority prefers to rest its decision on the second prong of Sec. 441d(a): that, although the mailing may not itself constitute express advocacy, it solicits contributions which are "earmarked for" express advocacy.
 
 
 71
 I find this resolution problematical. I do not think the majority, by basing its ruling on the contributions clause rather than the expenditures clause of Sec. 441d, is able to avoid the conundrum of "express advocacy"; rather, it removes the question to a greater level of abstraction. If, as the district court found, the mailing falls short of expressly advocating President Reagan's defeat, I fail to see how the majority can divine that contributions raised by the mailing would be put to more explicit use. The second inquiry necessarily incorporates the first: instead of asking whether the mailings engage in "express advocacy," it asks, do they solicit contributions which themselves would be used to do so? In the circumstances before us, I find the second question no easier than the first.
 
 
 72
 The difficulty in answering both questions lies in the particular nature of the defendants before us. As described at length in Part A of the majority's opinion, SEF meets the criteria set out by the Court in MCFL for a nonprofit political advocacy organization independent of corporate and labor interests: "(1) it was formed solely for the purpose of political advocacy and education; (2) it has no members or shareholders with an economic disincentive to dissociate with SEF if they disagree with its political advocacy; and (3) it is independent from corporate influence." Supra at 292.[1] Additionally, both defendants, so far as can be determined from the record, were likewise not affiliated with any specific political parties and did not endorse any candidates for public office.
 
 
 73
 Reviewing the July 1984 mailing as a whole, and taking into account the independent, issue-oriented nature of defendants, I would conclude that the mailing falls short of express electoral advocacy, and at least equally short of soliciting contributions for that purpose.
 
 
 74
 As the majority notes, the Supreme Court in Buckley and MCFL addressed the constitutional requirement that, in order to fall under various requirements of FECA, a communication must "expressly advocate" the election or defeat of a specific candidate for federal office. See MCFL, 479 U.S. at 248-49, 107 S.Ct. at 622-23; Buckley, 424 U.S. at 42-44, 80, 96 S.Ct. at 645-47, 664. The rationale for this requirement, the Court noted, was that "[c]andidates, especially incumbents, are intimately tied to public issues," and accordingly "[t]he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." MCFL, 479 U.S. at 249, 107 S.Ct. at 623 (quoting Buckley, 424 U.S. at 42, 96 S.Ct. at 646). Accordingly, the Court held in Buckley that to constitute "express advocacy," a communication must "contain[ ] express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " 424 U.S. at 44 n. 52, 96 S.Ct. at 647 n. 52.
 
 
 75
 Whether the July 1984 mailing reaches this level of explicitness, I admit, is a close question. The mailing falls somewhere between cases that have come out on different sides of this issue--in particular, between MCFL, 479 U.S. at 248-50, 107 S.Ct. at 622-24, which found express advocacy, and Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm. ("CLITRIM"), 616 F.2d 45, 53 (2d Cir.1980) (in banc ), which did not. In my judgment, the mailing, since it does not endorse any candidates but only criticizes an incumbent in the course of staking out positions on issues of public import, falls short of the express electoral advocacy found in MCFL.
 
 
 76
 In MCFL, the Court examined a pamphlet circulated by a pro-life advocacy group. The pamphlet announced "VOTE PRO-LIFE" and included 13 photographs of candidates who had earned a "triple yes" rating on pro-life issues; it also included a disclaimer which said, "This special election edition does not represent an endorsement of any particular candidate." 479 U.S. at 243, 107 S.Ct. at 620. The Court concluded that, despite the disclaimer, the pamphlet met the Buckley test of express advocacy because it "not only urges voters to vote for 'pro-life' candidates, but also identifies and provides photographs of specific candidates fitting that description." The pamphlet, the Court concluded, "cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, it provides in effect an explicit directive: vote for these (named) candidates." Id. at 249, 107 S.Ct. at 623.
 
 
 77
 In CLITRIM, in contrast, the in banc Second Circuit concluded that a somewhat similar issue-oriented leaflet fell on the other side of the "express advocacy" line. This case concerned a leaflet distributed shortly before the 1976 Congressional election by CLITRIM, a non-profit advocacy group affiliated with the John Birch Society. Two pages of the four-page leaflet set out the organization's anti-tax positions in general; the remaining two pages contained a photograph of a local Congressman, Representative Jerome Ambro, and a chart of his voting record, which was characterized as for "Higher Taxes and More Government." The leaflet informed readers, "If your Representative consistently votes for measures that increase taxes, let him know how you feel. And thank him when he votes for lower taxes and less government." 616 F.2d at 50-51 & n. 6. Although the leaflet clearly took aim at Representative Ambro on the eve of an election, we concluded that the leaflet "contains nothing which could rationally be termed express advocacy," in that it did not expressly "call[ ] for anyone's election or defeat." Id. at 53. We rejected as "totally meritless" the position taken by the FEC, which "would apparently have us read 'expressly advocate the election or defeat' to mean for the purpose, express or implied, of encouraging election or defeat." Id.
 
 
 78
 I believe CLITRIM, rather than MCFL, controls the case before us. While the mailing in question is arguably more explicit than the CLITRIM bulletin in advocating an incumbent's defeat, it does not, as in MCFL, specifically endorse a candidate. Rather, like the CLITRIM bulletin, it employs an attack on an incumbent, in the context of an upcoming election, as a means of bringing into sharp focus the organizations' longstanding concerns about issues of public importance. Although it comes close to express advocacy (e.g., "Vote Peace in '84"), the mailing, like the CLITRIM bulletin, lacks the "express words of advocacy of election or defeat" which the Buckley Court requires, 424 U.S. at 44 n. 52, 96 S.Ct. at 647 n. 52; it never expressly directs the reader to vote against President Reagan.
 
 
 79
 Furthermore, I believe that an issue-oriented attack on an incumbent by nonpartisan issue-oriented advocacy groups such as CLITRIM or the defendants in this case, must be distinguished from a mailing which expressly advocates on behalf of specific candidates, as in MCFL. Incumbents naturally provide the most convenient targets for anti-status-quo advocacy groups, and the best opportunities for sharply focused rhetoric in aid of ongoing issue advocacy. It is in such circumstances, I believe, that the warning of the MCFL Court--that the distinction between discussion of issues and advocacy for or against candidates "may often dissolve in practical application," MCFL, 479 U.S. at 249, 107 S.Ct. at 623--is most apt. Accordingly, I would characterize the July 1984 mailing not as express advocacy but as what the Supreme Court concluded MCFL's "Special Edition" was not--a "discussion of public issues that by their nature raise the names of certain politicians." Id.; see also Faucher v. Federal Election Comm'n, 928 F.2d 468, 470-71 (1st Cir.), cert. denied, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); Federal Election Comm'n v. National Org. for Women, 713 F.Supp. 428, 433-35 (D.D.C.1989).
 
 
 80
 The majority concludes that the contributions provision, construed so as to stay within constitutional limits,[2] reaches the mailing at issue. The majority (supra at 295) bases its conclusion, apparently, on one sentence in the cover letter from Dr. Spock, which says, "your special election-year contribution today will help us communicate your views to hundreds of thousands of members of the voting public, letting them know why Ronald Reagan and his anti-people policies must be stopped." This statement, the majority concludes, suffices to bring the mailing within the reach of the contributions clause since it "leaves no doubt that the funds contributed would be used to advocate President Reagan's defeat at the polls, not simply to criticize his policies during the election year." Supra at 295.
 
 
 81
 I cannot agree. The above-quoted passage, as well as the remainder of the cover letter by Dr. Spock and the two-page survey on the effect of a second Reagan term, inextricably mixes advocacy on public issues with an attack on the President. That contributions will be used to fund work by SEF and NMS on "pro-peace" issues, rather than simply to fund or oppose a candidate, is made particularly clear by the "voter certificate" which readers are urged to return with their contribution. This form does not say, for example, "I am enclosing my contribution to help fund NMS's efforts to defeat Ronald Reagan." Rather, it says:
 
 
 82
 YES, I HAVE VOTED "NO" TO WAR IN CENTRAL AMERICA. And because I want to continue helping National MOBILIZATION FOR SURVIVAL exert maximum election-year pressure to stop the violence in Central America, ban nuclear weapons, halt the arms race, promote safe energy, and meet human needs, I am enclosing my contribution ...
 
 
 83
 As noted above, when one asks whether such an advocacy group is engaging in express advocacy, one is required to examine whether its purpose is primarily to seek votes against the incumbent, or instead to advocate with regard to issues "that by their nature raise the names of certain politicians," MCFL, 479 U.S. at 249, 107 S.Ct. at 623. When the question is recast as "Is the group seeking funds targeted to the defeat of a candidate?" the question is no less difficult. At least when we attempt to determine whether a mailing constitutes "express advocacy," we have the benefit of a writing before us, the express language of which we can scrutinize. When instead the question becomes "For what goal are the funds targeted?" we are forced, at least to some degree, to abandon the writing and to attempt to speculate as to what advocacy the group might engage in in the future. In a close case like this--one, furthermore, in which the groups have not endorsed any candidates but have merely attacked the incumbent--I find the process of divining whether funds are "targeted for" express advocacy both uncertain and altogether too intrusive.
 
 
 84
 We have more than once expressed concern that the FECA be applied only to partisan political groups rather than to "movements dealing with national policy." See United States v. National Comm. for Impeachment, 469 F.2d 1135, 1141-42 (2d Cir.1972); CLITRIM, 616 F.2d at 54-55 (Kaufman, C.J., concurring). A broader attempt by the FEC to "regulat[e] the expression of opinion on fundamental issues of the day," we concluded, would be "intolerable." National Comm. for Impeachment, 469 F.2d at 1142. Although the specific holding of Impeachment has become moot in light of subsequent amendments to the FECA, the concerns expressed there have not.
 
 
 85
 Accordingly, I dissent.
 
 
 
 [1]
 NMS is not alleged to have violated this statutory provision, since it was not a corporation in 1984
 
 
 [2]
 It is a familiar prudential rule of our jurisprudence that courts will not decide difficult constitutional questions if other bases of decision are available. Zobrest v. Catalina Foothills Sch. Dist., --- U.S. ----, ---- - ----, 113 S.Ct. 2462, 2465-66, 125 L.Ed.2d 1 (1993); Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). We believe that it is consistent with Ashwander principles for us to reach the constitutional rather than the statutory question in this case. First, the "express advocacy" requirement is not a matter of pure statutory construction, but was added by the Supreme Court as a means of interpreting the statutory term "expenditure" to avoid constitutional overbreadth difficulties. See MCFL, 479 U.S. at 248-49, 107 S.Ct. at 622-23. Second, the question whether Sec. 441b can constitutionally be applied to a nonprofit, ideological corporation like SEF is not one of first impression. In deciding it, we do not break new ground but instead follow the analysis set forth by the Supreme Court in MCFL, 479 U.S. at 256-65, 107 S.Ct. at 626-32, and Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 661-65, 110 S.Ct. 1391, 1398-1400, 108 L.Ed.2d 652 (1990). Thus, both questions are constitutional in nature: one asks if this type of speech can be constitutionally subject to regulation, the other asks if this type of speaker can be. Since in this case we find the "express advocacy" question more difficult to resolve than the question whether Sec. 441b can constitutionally be applied to SEF, we think it is prudent under Ashwander for us only to decide the latter
 
 
 [1]
 The majority examines only whether SEF, and not NMS, met the MCFL criteria, since NMS was not a corporation in 1984 and so could not have violated Sec. 441b(a). See supra at 3 n. 1. However, nothing in the record suggests that NMS would not also meet these criteria
 
 
 [2]
 As the majority notes (supra at 295), Buckley provides a necessary limiting principle for the contributions clause: the provision may constitutionally reach only solicitations of contributions "that will be converted to expenditures subject to regulation under FECA."